<u>AGREEMENT</u>

THIS AGREEMENT, signed the 17th day of April, 2003, by and between LUV N'
CARE, LTD., a corporation organized under the laws of Louisiana, having its
principal divisional office and place of business at 3030 Aurora Avenue, Monroe,
Louisiana 71201 (hereafter "LNC") and Jackel International Limited a corporation
organized pursuant to the laws of England and Wales and having its principal
office and place of business at Dudley Lane, Cramlington, Northumberland,
NE23 7Rh (hereafter "Distributor").

WITNESSETH THAT:

Appointment:

1.1     LNC hereby appoints Distributor as its exclusive distributor for all accounts
        for the territory of United Kingdom, Ireland and Gibraltar (hereafter
        "Territory") for all baby brand products and accessories, such as baby
        bottles, teethers, coolbites pacifiers, pacifiers, pacifier clips, soothers,
        tableware, utensils, cups, nipples, bibs, playthings and grooming and
        other related feeding accessories ("Baby Products") produced and/or
        marketed by LNC as Nûby Baby Products (including but not limited to
        those listed in Exhibit 3 hereafter called the "Products")

1.2     LNC hereby grants to Distributor an exclusive license to manufacture, sell,
        supply and market the Products in the Territory and for the avoidance of
        doubt LNC shall retain the right to manufacture, sell, supply or market the
        Products outside of the Territory.

1.3     Subject to clause 2, LNC shall not, and shall procure that no other person,
        firm or company shall distribute by sale, gift or otherwise the Products

**Exhibit B**

which Jackel has chosen for sale bearing the Nuby name in the Territory except in accordance with this Agreement and subject to EU Laws.

1.4   LNC agrees that should LNC develop any new product(s) which is a Baby Product for the purposes of this Agreement, whether branded NUBY or not, then it shall grant to Jackel the right of first refusal to sell such products in the Territory under the terms of this agreement. The Distributor shall notify in writing LNC within 60 days of receipt of Luv n' care submitting a working model, sample or concept of the new product to Distributor that it intends to market within the Territory. Luv n' care will have the right to market its new product to a third party if in fact Distributor either does not exercise its right of first refusal option or does not provide a launch plan for the new product within 180 days of Distributors written notification of intent to purchase new product. The launch plan must have the launch date of the new product no longer than 9 months from the date of receipt of the working model, sample or concept.

1.5   The parties agree that neither this appointment nor the distributorship hereby created has any monetary value to Distributor.

1.6   Except for orders or inquiries covered by paragraph 2, LNC will transmit to Distributor all inquiries concerning orders for Products received by LNC from prospective purchasers within, and/or for use or sale within, the Territory. Distributor shall neither keep supplies of Products nor actively promote the sales of Products outside the Territory.

1.7   Distributor is granted exclusive distribution rights within the Territory for those Products identified in Exhibit 3.

1.8   Commissions and sales minimums shall be Pounds sterling.

**Exhibit B**

2.  <u>Government and U.S. Personnel</u>:  LNC through its subsidiaries reserves the right to accept and execute orders for Products received from diplomatic offices, U.S. Armed Forces, and other U.S. Government Agencies, Post Exchanges, or similar installation conducted primarily for the use of U.S. personnel, whether civilian or military, in the Territory.

3.  <u>A.  Promotion and Sales</u>:  Distributor shall use its reasonable efforts to maximize the distribution and sale of Products, throughout the Territory, and to promote the image of quality and value of Products sold under the Intellectual Property Rights.  Distributor shall expand distribution to good quality accounts in the infant care markets and support distribution with brand awareness and high quality customer service.
    <u>B.  Commencement Date</u>  ("the Commencement Date") shall be 1 January 2003.

4.  <u>Product Prices and Terms</u>:

4.1  When ordering from LNC or LNC's authorized factories, Distributor may use either LNC's standard purchase order form as amended from time to time (Exhibit 7a), with Luv n' care terms and conditions applying or the standard purchase order form of the Distributor excluding its terms and conditions (Exhibit 7b).  The Distributor will transmit a copy of each completed form to LNC for its records.

4.2  All orders and purchases of the Products by the Distributor shall be at prices quoted to Distributor on LNC's price list (F.O.B. LNC or its authorized manufacturing facility(s).)  Prices set by LNC and its authorized manufacturers are based on full container shipments (F.O.B.) Factory. LNC may make reasonable changes to its standard ("cost A pricing") prices which appear on LNC's standard price list and other sales terms at any time upon thirty (30) days notice to Distributor.

**Exhibit B**

4.3    Distributor shall cause to have manufactured all or some of the Products either:

4.3.1  by LNC at its own factory;

4.3.2  at authorized factories/by authorized manufacturers as listed in Exhibit 6 or as may be nominated by LNC from time to time or as may be nominated by the Distributor and approved by written consent of LNC; or

4.3.3  by the Distributor at its own factory with the written consent of LNC not to be unreasonably withheld;

and the contents of this Agreement shall be construed accordingly with the general sales conditions applying the "Terms of Sale".

4.4    In the event of any conflict between the terms of this Agreement and the terms of LNC's or the Distributor's purchase order form, the terms of the Luv n' care Purchase Order shall apply.  Prices of invoices and orders shall be in U.S. dollars.

5.     A.  Terms of Payment: Distributor may negotiate its own payment terms including letter(s) of credit with either LNC's factory or an authorized factory(s)..  In any event, Distributor will be fully responsible for payment and/or payment terms to each manufacturer.  However, said arrangement will not abridge or affect Distributor's obligations under this Agreement to timely make all payments to LNC for commissions, orders, etc except as defined under clause 22b.  The failure of Distributor to promptly make payments will entitle LNC to declare any invoice immediately due and payable, and further to suspend further deliveries or subject such deliveries to cash payment.  Distributor shall accept, assume and bear all risk of loss or damage to Products from any and all causes which may occur after delivery of Products by LNC or one of its authorized manufacturers into the possession of Distributor's carrier (F.O.B.) at LNC's manufacturing facility(s) or its authorized factory(s) for shipment to

**Exhibit B**

Distributor.   Distributor shall be liable for all charges and expenses associated with obtaining the clearance and release of products from custom officials and all transportation insurance, taxes, VAT, and other costs. Interest for late payment of royalties or commissions due LNC or for Products purchased directly from LNC will accrue at a rate of 1% per Month automatically, and without notice required, on the amounts unpaid after the said due date.

B.  Report/Audit: Distributor agrees to keep and maintain records at its headquarters of all sales of Licensed Trademark Products under this Agreement.  Furthermore, Distributor agrees to maintain manufacturing documents which will  reasonably confirm the exact production amounts of Products manufactured by or for Distributor. LNC may appoint an auditor or independent certified public accountant (C.P.A.) who shall be permitted on reasonable notice to review and/or audit, as often as once every twelve (12) Months, at LNC's reasonable discretion, all of Distributor's accounting records relating to Licensed Trademark Products to verify production, inventory, and sales records and statistics.  Copies of all Distributor's invoices shall be available to the C.P.A. or auditor.  Distributor shall also keep suitable records provided for this purpose in sufficient detail for a period of two (2) years from the end of this Agreement or any extensions thereof to enable the C.P.A. or auditor to determine commissions due LNC pursuant to this Agreement and shall further permit such records to be examined by the C.P.A. or auditor on reasonable notice.  If said audit determines a deficiency in payment of commissions of 15% or greater, Distributor will pay said deficiency in commissions and reimburse LNC for all costs of any audit including interest on unpaid commissions.

C. _____ : At the end of each contract year Distributor shall submit to LNC a full inventory of all Products unsold.

**Exhibit B**

6.   Defective Merchandise: LNC or its authorized factory(s) will accept claims
     for defectively manufactured Products within six (6) Months after the
     receipt of shipment by Distributor.   LNC and/or the authorized
     manufacturer, whichever produced the merchandise, will at Distributors
     discretion repair, replace or reimburse Distributor for defective
     merchandise within thirty (30) days from the date LNC deems the
     merchandise to be defective.  Should a dispute arise between LNC and
     Distributor in relation to defective merchandise for any reason regardless
     of cause then both parties agree to submit to an independent third party
     mediator for resolution of the dispute, such independent third party to be
     jointly nominated by LNC and Distributor.  The determination by third party
     specified shall not be binding on either party.  LNC agrees to credit
     Distributor upon return of any defective products for any commission paid
     on said products supplied by LNC or which is manufactured by LNC's
     authorized manufacturer(s) at manufacturers expense.  If said Products
     fail to meet governmental standards or regulations for the Territory, LNC
     will reimburse or ensure reimbursement to Distributor for Products and
     commissions paid.  However, it is the responsibility of Distributor to make
     sure each product complies with all of its government's regulations prior to
     ordering and shipping of each order.  It is not the responsibility of LNC or
     its manufacturers to know Distributor's regulations in their Territory.  In the
     event Distributor or one of Distributor's authorized manufacturer(s), which
     has been approved by LNC, produces a new product or a change in
     Products, which LNC does not supply, written approval, Distributor will be
     fully responsible for said Products and any commissions therefore paid to
     LNC will not be reimbursed.   All product changes to Products
     manufactured by Distributor or Distributor's authorized manufacturer(s)
     must be approved in writing by LNC.

**Exhibit B**

7.   Confirmation of Orders:   LNC or LNC's contract manufacturer shall confirm orders from Distributor within five (5) business days after their receipt, and LNC will advise delivery date within ten (10) days and use its reasonable endeavors to execute deliveries within twelve (12) weeks and no more than sixteen (16) weeks of receipt of signed executed order forms from Distributor, subject to all specifications in relation to products ordered having been approved by the relevant parties.  LNC will accept only orders made on forms approved by LNC or Distributor's standard purchase order form (Exhibit 7b, excluding Distributor's terms and conditions). Orders may be placed by Distributor in writing by letter or fax, all of which shall be deemed submitted pursuant to the terms of this Agreement, and no order of Distributor shall be deemed an amendment of this Agreement unless such purpose be expressly stated in writing and signed by both parties.  It is also understood that before LNC or its approved factories can advise a delivery date Distributor must make sure that it has completed and submitted all specifications for both product and packaging to the authorized factory for manufacturing.

8.   Contract Minimums: If deliveries are not made in accordance with clause 7 above where manufacture of the Products has been carried out by a factory specifically authorized by LNC as set out in Exhibit 6 and provided for in clause 4 or by LNC at its own factory(s) then if such failure results in any termination by a third party of an existing contract or any product de-listing by any third party with the Distributor or an event occurs which has a material effect on the Distributors ability to sell in the territory (for example the Distributor is prevented from using the Intellectual Property Rights within the territory for any reason or the intellectual property is used on competitive products within the territory or there is a material out of

**Exhibit B**

stock situation), the Distributor shall, and LNC agree to, renegotiate the minimum sales levels and commission payable under the terms of this Agreement and referred to at clause 22 and Exhibit 2 hereof this Agreement.

9.   Force Majeure:  Except for Distributor's obligation to make timely payment for Products already shipped by LNC, which shall not be affected by this paragraph, each party to this Agreement shall be excused from performance hereunder due to delays caused by force majeure.  As used herein, the term "force majeure" shall mean and include, without limitation, acts of God, fire, declared and undeclared war, earthquake, strike, lock-out, civil commotion, sabotage, armed aggression, confiscation, acts or restrictions of any government or governmental agencies, shortages or interruptions of facilities or material supply, orders of court, and any other circumstances beyond such party's reasonable control.

10.   Communication and Planning:   Distributor shall provide sales plan or projection on an annual basis to LNC as represented in (Exhibit 9).

11.   Legal Representatives:  Except as expressly provided herein, Distributor, its agents, subsidiaries, affiliates, and employees are in no way the legal representatives or agents of LNC for any purpose whatsoever and have no right or authority to assume or create, in writing or otherwise, any obligation of any kind, express or implied, in the name of or on behalf of LNC.  Distributor shall not make any claims or representations about the Products which have not been expressly authorized in writing by LNC.

12.   Rule and Statutes:  At its own cost and expense, Distributor shall comply and abide with all laws, ordinances, rules and regulations of all empowered authorities and regulatory bodies in the Territory.  Distributor shall secure and obtain any and all permits, licenses and consents and

**Exhibit B**

pay all taxes as may be necessary in connection herewith. LNC agrees to provide Products which meet all applicable statutes and regulations solely in respect to the quality, composition, packaging, and labeling of Products which are in effect at time of shipment. Distributor agrees to promptly furnish LNC with all necessary information concerning said statutes or requirements.

13.    Clear Expectations:  Distributor shall take no measures to enforce or secure adherence by retailers to retail prices suggested by LNC.  LNC shall not require or request Distributor to take any such measures. Distributor shall be under no limitation as to the price at which or the customer to whom within the Territory, it may sell the Products.  Distributor shall be free to sell merchandise manufactured by sources other than LNC, whether or not in competition with Products.  Nothing in this paragraph shall modify or impair, Distributor's express obligations under any provision of this Agreement.  The Distributor who has experience in marketing infant care products may sell infant care products other than LNC products and shall not be a basis of dispute between the parties.  It is also agreed that Distributor has the right to subcontract the marketing and/or selling and/or logistics of Products.

14.    Indemnification and Insurance:  The prices, terms and conditions of this Agreement have been fixed in express awareness and consideration of the following allocation of liability for third party claims which may arise pursuant to performance hereunder.  The Distributor shall carry product liability insurance covering Products in the Territory.  In the Territory, and only in the Territory, Distributor shall indemnify and hold LNC harmless of and from all judgements, damages, awards, suits, claims, fines, penalties, and expenses (including reasonable attorneys' fees) arising directly or

**Exhibit B**

indirectly as a consequence of the performance or failure or breach of performance by Distributor which results in damage to third party property or third party injury only and where the Distributor is held to be legally liable. In defending any such claim, action, or proceeding, LNC, if a party to the proceeding, may use counsel of its own selection or may require Distributor to retain and pay reasonable counsel's costs such counsel being counsel acceptable to LNC. Distributor represents, warrants, and covenants that all Product it sells shall be covered, regardless of where sold, by comprehensive product liability insurance with minimum limits of liability in the amount of $5,000,000/$5,000,000 bodily injury coverage and $500,000 property damage coverage and is covered by contractual liability insurance with identical policy limits, and that with this Agreement, Distributor shall deliver to LNC a certificate of insurance indicating coverage in effect as outlined herein above.  Such certificate shall also include all policy numbers, insurers, expiration dates, and a provision that the coverage will not be canceled without at least thirty (30) days prior written notice to LNC.

15.  LNC shall indemnify and keep indemnified Distributor against all actions, claims, costs, damages, expenses and other liabilities arising out of Distributor's use of the Intellectual Property Rights in accordance with the terms of this Agreement, including but not limited to, any claims that Distributor's use of the Intellectual Property Rights infringes the intellectual property rights of any third party.

LNC is the sole legal and beneficial owner and the registered proprietor of the Intellectual Property Rights and has not granted any other licenses in respect of the Intellectual Property Rights in the Territory to any third parties other than Distributor.

**Exhibit B**

There is no litigation or other dispute or claim (whether actual or pending) in relation to any of the Intellectual Property Rights of which LNC is aware with the exception of the pending litigation between Luv n' care and the Avent Company.

16.   Laws Governing:   LNC and Distributor agree that the validity and interpretation of this Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana, United States of America, and further agree that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled in the State of Louisiana, Parish of Ouachita, United States of America, and the decisions of said courts shall be binding on both parties.   LNC and Distributor hereby consent to the jurisdiction of the above-named forums for the adjudication of any such claim or controversy.   The parties agree to sign both an English version and a version in the language primarily spoken in the Territory.   However, the English language version shall govern if a dispute as to the terms of this Agreement occurs.   Distributor agrees to accept service of documents or process for any legal proceedings related to this Agreement by registered mail as described in Paragraph 24.

17.   Intellectual Property Rights:   Distributor hereby acknowledges that the Intellectual Property Rights that are the subject of this Agreement, and any combinations thereof are good and valid between the parties and that Distributor will not challenge their validity or ownership during the term of this Agreement or thereafter.   Distributor further acknowledges and hereby agrees that LNC has the exclusive rights in the Territory to the use of the Intellectual Property Rights (including but not limited to, LNC's rights in

**Exhibit B**

connection with advertising materials, copyrighted packaging and/or other related materials associated with the Products), and that Distributor has no right or interest therein or in any other trademark, trade name, or brand name of LNC or its Licensors except as expressly provided herein. Distributor will not in any way infringe or contribute to the infringement by others of the rights of LNC in said Intellectual Property Rights, but will immediately notify LNC upon suspecting or learning of such infringement by others in the Territory.  Distributor will only use the Intellectual Property Rights pursuant to this agreement and / or in a manner approved by LNC. LNC shall be obliged to ensure and shall be solely responsible for the protection and maintenance of the Intellectual Property Rights.

18.  Termination of Intellectual Property Rights:   Upon termination of this Agreement, all rights of Distributor to the trade names, drawings and designs of LNC, products configuration, proprietary designs, proprietary information and brand names shall immediately cease and terminate, provided always that LNC agrees to use its reasonable endeavors to assist the Distributor to fulfil all the Distributors existing contractual obligations as may exist at the date of termination and the Distributor shall have no further rights thereto and shall make no claim thereto or against the use thereof in the Territory by LNC or against the use by other duly authorized distributors or agents of LNC or other owners of the Intellectual Property Rights.  All advertising materials, confidential information, and related documents and materials shall be destroyed by Distributor within ninety (90) days of notice of termination.

19.   <u>Term of Agreement:</u>

19.1   The Term of this Agreement shall commence on the Commencement Date as specified at clause 3B.

19.2   Subject to paragraph 19, the term of this Agreement shall be for a period of Three (3) years and Three (3) months, continuing thereafter for multiple renewable periods of two (2) years each upon 180 days advance written notice given by one party to the other unless terminated by either party prior to the expiration of each term. Each two year renewable period shall be renegotiated and agreed to by both parties six (6) Months prior to the expiration of each two (2) year renewable period.   The points to be renegotiated are commission rates and guarantees, but are not limited to these two points.

20.   <u>Termination:</u>

(a)   In addition to any rights and remedies which LNC may have under the law or equity, LNC may terminate this Agreement for cause by giving Distributor written notice of such termination by registered mail, the effective date of which shall be not less than ninety (90) days after the date of receipt of the notice by Distributor in the event that:

(i)   Distributor ships or sells products outside the Territory as defined in paragraph one herein; or

(ii)   Distributor fails to achieve the minimum sales required to meet the provisions of clause 22

**Exhibit B**

during the initial three year term of this Agreement and fails to pay the minimum commission amounts set out in Exhibit 2; or

(iii)   Distributor fails to remedy breach within sixty (60) days of receipt of any notice of default (with the exception of a quality breach which should be remedied within 30 days), including failure on the part of Distributor to make payment of invoices or commissions to LNC in accordance with the terms of this Agreement. The period of notice will be deemed to commence on receipt of notice which should identify any said breach.

(b)   Distributor may only terminate this Agreement, by giving LNC written notice of such termination by registered mail, the effective date of which shall not be less than ninety (90) days after the receipt of notice by LNC, if LNC fails to carry out any or all of its obligations set forth in this Agreement and continues to fail to do so after the expiration of one hundred and eighty (180) days after actual receipt of written notice from Distributor specifically stating those respects in which Distributor believes LNC has failed to perform its obligations.  Termination of this Agreement shall not release either party hereto from any liability which at the time of termination has already accrued to the other party hereto or which thereafter may accrue in respect to any act of omission prior to such termination.  LNC at its option may repurchase Products from Distributor at the landed cost paid by Distributor or at any price

**Exhibit B**

agreed to between Distributor and LNC. If the inventory is not repurchased by LNC, parties agree that any dispute should be settled in good faith and in the best interest of each party in order to avoid destruction on the one hand and market dumping on the other hand. The sell-off period for such inventory shall be four (4) Months unless otherwise agreed in writing between the parties provided always that where any inventory held by the Distributor is destroyed as a result of termination of this Agreement, the Distributor shall not be liable to make any commission payments to LNC in respect of such inventory.  In the event of a termination of the contract by either party, LNC at its option, MAY DEMAND all commissions due on unsold Products by Distributor be paid within thirty (30) days of that termination unless those Products are destroyed as set out above.  Commissions in advance are to be paid and calculated by using the average selling price the Distributor sold each Products for in the preceding twelve (12) Months.

(c)     The Agreement will remain valid if another company acquires LNC unless that company is a competitor of the Distributor in which case the distributor can serve 90 day's notice of termination.  In the event any license, property or trademark which has been licensed to LNC is terminated, the remaining portion of this contract will remain in force without any change with the exception of minimum sales and commissions as set out in exhibit 2 which will be revised downwards in relation to the termination as described in this sub clause.

**Exhibit B**

21. <u>Use of Confidential Information</u>:  During the term of this Agreement and continuing after the expiration or termination hereof, either party shall not disclose or make accessible to anyone, or make use of the knowledge or information which either party obtains or obtained during the term of this Agreement with respect to formulae, trade secrets, Products design, patents, drawings, business plans, prototypes, procedures, and methods any other proprietary designs or information of the other party without the written consent of the other party.  Either party acknowledges receipt of confidential and non-confidential proprietary information from the other party.  Distributor agrees not to use in any fashion said information or designs, or any colorable imitations thereof, upon termination of this Agreement.  Any use by Distributor of said property without LNC's written consent will convey royalty and commission rights upon LNC at a rate not less than those set herein, without waiving any other remedies available to LNC.   Furthermore, Distributor shall keep confidential all terms and conditions   created   by   this   Agreement   from   any   third   party.

**Exhibit B**

22.   <u>Minimum Sales and Commission Payments</u>:

(a) Principle of calculation of the commission owed by Distributor to LNC:
The rate of commission (see Exhibit 2) will apply to the actual
Sales of Distributor.  Sales are net sales (less VAT, local taxes, discounts
and rebates).

      (b) Distributor shall pay commissions based on sales not less than
those listed in Exhibit 2.  Said minimums shall not be presumptive of
Distributor's efforts to sufficiently market the Products.

Distributor shall pay LNC a commission as agreed to in Exhibit 2.  Within
fifteen (15) days of the end of each quarter, the Distributor shall provide
LNC with sales reports.  Distributor shall pay each invoice raised by LNC
relating to such sales reports in accordance with this clause within fifteen
(15) days of the date of receipt of invoice.  The parties further agree to
adopt the payment schedule as set out in Exhibit 5.  Upon expiration of the
term and any extensions thereafter of this Agreement, LNC will invoice
Distributor for payment of any shortfall of the guaranteed commission ("the
Guaranteed Commission") which was not met and paid, if actual
commissions fail to meet Guaranteed Commission amounts.  Distributor
may add those sales corresponding to orders timely placed during the
contract term period which are not timely delivered toward the minimum in
the event of any shortfall in Guaranteed Commission.  Distributor shall be
obligated to make payment for said shortfall at the end of each contract
year.

**Exhibit B**

23.   Advertising:   Distributor will promote the Brands/Baby Products using merchandising materials and advertising materials as approved or accepted by LNC.   Provided LNC has approved all advertising material, (display, window sticker, leaflet, etc.), Distributor may advertise at any professional fairs exhibitions (either international or national).  Distributor may utilize any approved advertising, press releases, or financial statements which have been approved herein or previously hereto.

24.   Notices:  All notices, reports, or other correspondence which may or must be given under this Agreement shall be sent by registered mail, return receipt requested, in the case of LNC to:

> Luv n' care, Ltd.
> Attn: Nouri E. Hakim
> 3030 Aurora Avenue
> Monroe, Louisiana, USA 71201

and in the case of Distributor to:

> The Company Secretary
> Jackel International Limited
> Dudley Lane
> South Cramlington Industrial Estate
> Cramlington
> Northumberland
> NE23 7RH

25.   Assignment:   This Agreement may not be assigned or transferred by Distributor in any manner whatsoever (including but not limited to, by merger, consolidation, or purchase of a substantial part of the assets of Distributor or of a controlling interest in the voting stock of Distributor) without the written consent of LNC which shall not be unreasonably withheld by LNC unless the assignment is a competitor of LNC.   Any

**Exhibit B**

assignment of this Agreement by LNC may not abridge the rights of Distributor hereunder.

26. <u>Unenforceable Provisions</u>:  If any provision of this Agreement shall be or become illegal or unenforceable in whole or in part for any reason whatsoever, the remaining provisions shall nevertheless be deemed valid, subsisting, and binding on the parties hereto.

27. <u>Waiver</u>:  The waiver by either party of a breach of violation of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or violation thereof.

28. <u>Entire Agreement</u>:  This Agreement contains the entire and only agreement between the parties hereto and cancels and supersedes all pre-existing proposals, agreements, and/or understandings between the parties respecting the subjected matter hereof, and any representation, promise, or condition in connection therewith not incorporated herein is canceled and shall not be binding upon either party.  This Agreement may not be released, discharged, abandoned, changed, modified, amended, or renewed in any manner, except by written agreement signed by both parties.

29. Dispute Resolution

29.1 The parties shall attempt to resolve any dispute arising out of or relating to this Agreement through negotiations between senior executives of the parties who have authority to settle the same.

29.2 If the matter is not resolved through negotiation then the parties will use their best endeavors to resolve the dispute through an agreed form of mediation procedure.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, the day and year first above written.

**Exhibit B**

Exhibit 1

Trade Marks

# NÛBY

Exhibit 2

**Exhibit B**

Signed by

Luv N' Care Limited

Signed by

Jackel International Limited

**Exhibit B**

## MINIMUM SALES

| | | Minimum Sales | Minimum Commission |
|---|---|---|---|
| Period 1 | 1st Jan 2003 – 31st March 2004 | £2,300,000 | £148,750 |
| Period 2 | 1st April 2004 – 31st March 2005 | £2,850,000 | £183,125 |
| Period 3 | 1st April 2005 – 31st March 2006 | £3,550,000 | £226,875 |

These minimum sales incorporate total utilization of the NUBY accessories line up (present and future) in the categories identified as "baby brand products and accessories" in clause 1.1, with the exception of sales generated through ASDA relating to the own label cup program.

Sales under item 1, will only count towards the minimum commission payable, as shown above.

1. Commission rate on all Nûby brand products is to be:

On sales of 0 to £2,000,000            6.50%

On sales of £2,000,000 to £4,000,000   6.25%

On sales of £4,000,000 +               6.00%

2. Commission rate on all Nûby product purchased in bulk.

Each Nipple                US$0.03

The Above commissions apply where NUBY only appears on bulk as follows:
*Under license by Nûby*

3. Commission rate for Distributor chosen products:

For products which are over $4.00 factory cost. (Item to be agreed to by both parties and approved by LNC). Example, gift sets, electronic items, electrical items, diaper bags, tubs, stools, etc.

4% commission on Distributor sales

4. For each renewable 2 Year Period, sales figures must be agreed to by the Distributor and LNC prior to the one hundred eighty (180) day notification in which Distributor intends to renew.

**Exhibit B**

Exhibit 3

PRODUCTS

**The Products**

The Distributor shall have exclusive sales rights for the following products in the territory:

All Nuby products in the following classes:

**Bottles**

| | |
|---|---|
| 24101 | WN 8oz bottle with 3 flow Nuby teat and heat sensor - single |
| 24101 | WN 8oz bottle with bi tone med teat |
| 24101 | WN 8oz bottle with bi tone teat stage 2 |
| 24102 | WN 10oz bottle with bi tone teat |
| 24102 | WN 10oz bottle with bi tone teat stage 2 |
| 24105 | WN 9oz bottle with 3 flow Nuby teat and heat sensor - single |
| 24105 | WN 9oz bottle with 3 flow Nuby teat and heat sensor - triple |
| 24104 | Starter Kit |
| 1468 | Std neck 8oz natural nurser with Nuby 3 flow teat - single |
| 1469 | Std neck 6oz natural nurser with Nuby 3 flow teat - single |
| 1570 | WN Nuby bottle 9oz – single (without HS) |
| 1570 | WN Nuby bottle 9oz - twin (without HS) |
| 1569 | WN Nuby bottle 6oz – single (without HS) |
| 884 | WN No Spill Gripper Cup |
| ID4310 | Std neck Nûby bottle 270ml - single BC |
| ID4310 | Std neck Nûby bottle 270ml - twin BC |
| 1407 | Std Neck Curved bottle 6 oz triple pack |
| 1413 | Std Neck Curved bottle 8 oz triple pack |
| ID 4311 | Std neck bottle with med bi tone teat 5 oz stage 2 |
| ID 4310 | Std neck bottle with fast bi tone teat 10 oz stage 2 |

**Exhibit B**

## Bottle Accessories

| | |
|---|---|
| 5515 | Bottle brush with TPE. |
| 5520 | Bottle brush (large wire) |
| 5516 | Bottle brush with TPE and sponge |

## Nipples

| | |
|---|---|
| 906 | WN Nuby nipple 2 pack 3 flow rates |
| 906 | WN Nuby nipple 4 pack 3 flow rates |
| 24 | Std neck Nuby nipple 2 pack 3 flow rates |
| 25 | Std neck Nuby nipple 4 pack formula flow (medium) |
| 905 | WN Nûby nipple twin pack formula flow - medium |
| 931 | WN Nûby nipple twin pack fast flow |
| 923 | WN Nuby non spill variable flow nipple twin pack |
| 00919 | Std neck bi tone Nûby nipples medium flow - twin pack |
| 00919 | Std neck bi tone Nûby nipples fast flow - twin pack |
| 024 | Std Neck Nuby teats variflow x 2 |
| | WN bi tine teats med x 2 |
| | WN bi tone teats fast x 2 |
| 00919 | Std Neck bi tone teats med x 2 |
| 00928 | Std neck bi tone teats fast x 2 |
| 4150 | Std neck ortho teats slow x 2 |
| 4151 | Std neck ortho teats med x 2 |
| | Std neck ortho teats fast x 2 |
| | WN bi tone non spill teat |
| | Std neck bi tone spill teat |

## Pacifiers

| | |
|---|---|
| ID4723 | Soft shield twin pack - newborn colors |
| ID4723 | Soft shield twin pack - toddler colors plain |
| ID4723 | Soft shield twin pack - toddler colors decorated |
| 5929 | Circle shield actuating pacifier |
| 5935 | Butterfly shield actuating pacifier. |
| | |
| 5944? | Ice gel pacifier |
| ID4705 | Nuby Soothers 0+ size 1 baglet MOL |
| ID4705 | Nuby Soothers 3+ size 2 baglet LOL |

**Exhibit B**

ID4705      Nuby Soothers 6+ size 2 baglet LOL
ID 4701     Butterfly design with soft shield and nuby baglet small
ID 4701     Butterfly design with soft shield and nuby baglet large
5932        Actuating ortho soother

## Cups

880         No Spill cup with flip it cap 7oz
882         No Spill cup with flip it cap 9oz
830         Leak resistant straw flip lid 10 oz
835         Leak resistant straw flip lid 14 oz
851         Non Spill cup 7oz
879         Mini sipper with 2 shot lid
868         Mega sipper with 2 shot lid
800         Twin handled no spill 2 shot snap on lid

## Plates and Bowls

5311        Finger bowl plus new HS spoon
5220        Section plate
5311        Weaning Bowl
5243        Microwave bowl

## Cutlery

5277        New spoons 2 pack
5268        Toddler spoon and fork - pearl colors
5235        Heat safe soft tip spoon triple pack
5244        Soft tip spoon
5253        Toddler and spoon
5247        Heat sensor spoons

## Bibs

4171        Embroidered terry bibs
4114        Teether edge bib
4109        10 piece bib set
?           Easy fasten decorated bib

**Exhibit B**

**Playthings**

6030      Soft teething terry animals
6070      Plush rattle - 6 pcs in display counter box

**Teethers**

454       Teething ring
456       Fruit Teethers
          Icy bite teether -- elephant design
          Icy bite teether -- alligator design

**Exhibit B**

Exhibit 4

Specifications

**Product Specifications:**  Specifications include specific technical requirements such as

colors, smell, quality level (as in relationship with government regulations), quantity, and

delivery date.  Specifications may differ for each item and may be modified by

Distributor upon and with written approval by LNC and reasonable notice to LNC.

**Packaging Specifications:**  Specifications for packaging must accompany all

orders.  In the event of a packaging change Jackel must re-submit packaging art

and any criteria LNC deems necessary to produce said packaging.

**Exhibit B**

Exhibit 5

Payment Schedule

## MINIMUM PAYMENTS

|  | Min. Sales | Min. Commissions |
|---|---|---|

**1.  Period 1   1st Jan 2003 – 31st March 2004**     £2,300,000     £148,750

Minimum payments for Year One is £148,750 divided 4 quarters = £37,187.50 per quarter.  Minimums are cumulative and are not based on actual sales.  However, once cumulative minimums equal yearly guarantee there is no longer a need to send quarterly minimums.

|  | Min. Sales | Min. Commissions |
|---|---|---|

**2.  Period 2   1st April 2004 – 31st March 2005**     £2,850,000     £183,125

Minimum payments for Year Two is £183,125 divided 4 quarters = £45,781.25 per quarter.  Minimums are cumulative and are not based on actual sales.  However, once cumulative minimums equal yearly guarantee there is no longer a need to send quarterly minimums.

|  | Min. Sales | Min. Commissions |
|---|---|---|

**3.  Period 3   1st April 2005 – 31st March 2006**     £3,550,000     £226,875

Minimum payments for Year Three is £226,875 divided 4 quarters = £56,718.75 per quarter.  Minimums are cumulative and are not based on actual sales.  However, once cumulative minimums equal yearly guarantee there is no longer a need to send quarterly minimums.

**4.  Commission rate on all Nuby products purchased in bulk at an agreed to rate are due quarterly and are not considered a part of minimum guarantee.**

**Exhibit B**

5.  Commission rate on all Distributor chosen products purchased at an agreed to rate are due quarterly and are not considered a part of minimum guarantee.

Exhibit B

Authorized Factories

Art-A-Power
        Block C, 9/F
        Hong Kong Spinners Ind. Bldg.
Phase 5, 760 Cheung Sha Wan Road
Kowloon, Hong Kong

Elung Industrial Company
#606, Tower 2 Silvercord
30 Canton Road
Tsimshatsui, Kowloon, Hong Kong

Regal Enterprises, Ltd.
Flat 16, 18th Floor
Honour Industrial Centre
6 Sun Yip Street
Chai Wan, Hong Kong

YiShing Co., Ltd.
Room 102-103, 1st Floor
Tuang Chai Bldg
86-90 Wellington Street
Hong Kong

Exhibit 7a

Luv N' Care Order Form

PO#(to be assigned by LNC)

Date:        *Current Date*

To:        Eluńg Industrial Co. Ltd.
                                         From:
                   Luv n' care. Ltd.
                   P.O. Box 95482

                                                                        P.O.

Box 6050
Tsim Sha Tsui

Monroe, LA 71211

Hong Kong

Ship to: _____

                          Invoice to:
                          _____
_____

Contact:

Attn:

| | | | | Dist. # | LNC # | Description |
|---|---|---|---|---|---|---|
| | | | | | Form Pkg dz    Total | # dz    $per |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Exhibit B**

Total Cost=$

USD

Ship date: *00/00/00*

Packing:          All must be packed 6 pcs inner & 12 dozen master (Example)

     Freight:          FOB China

     Freight Carrier:     Contact _____, for shipping instructions

       Payment:

ial Instructions:

iments needed by Distributor.  These documents must be sent for customs purposes:
    Packing List
    6. Original Certificate of origin of C.O. Form A-1-Correct international tariff code must appear on form A.
    7. Original Re-Export
    8. Original B/L
    9. Fax on all shipping details for insurance purposes

:IAL INSTRUCTIONS:

   2.

number, quantity and purchase order number must appear on all documents.

   Upon receipt of all orders send the pro-form invoice to our office, I will then forward to  the Distributors.

**Exhibit B**

<u>Exhibit 7b</u>

Distributor Standard Order Form

## Conditions of Purchase

1 DEFINITIONS:
i The term "Buyer" shall mean the person, firm or company so named in the Purchase Order
ii The term "Seller" shall mean the person, firm or company to whom the Purchase Order is issued.
iii The word "Goods" includes all goods covered by the Purchase Order, whether raw materials, processed materials, or fabricated products
iv. The term "Purchase Order" shall mean the Buyer's Purchase Order, which specifies that these conditions apply to it
v The term "Contract" shall mean the contract between the Buyer and Seller, consisting of the Purchase Order, these conditions, and any other documents (or parts thereof), specified in the Purchase Order. Should there be any inconsistency between the documents comprised in the Contract, they should have precedence in the order herein listed.

2. CHOICE OF LAW & INTERPRETATION
This order shall be governed and interpreted in accordance with the Laws of England.

3. AMENDMENTS.
i The Seller in accepting this order shall be deemed to agree that the Contract shall form a contract of purchase to the exclusion of all other terms, whether agreed between the parties prior or subsequent to the date hereof, except those terms agreed and confirmed in writing by both parties.
ii No alteration in prices shall be effective, unless accepted and confirmed in writing by both parties.

4 DELIVERY
i All Goods must be delivered to the delivery point specified in the Purchase Order at the expense of the Seller
ii The date stated by the Buyer in the Purchase Order for shipment or delivery of goods shall be of the essence of the contract.
iii Delivery of incomplete orders shall be permitted only with the prior consent of the Buyer and in giving consent the Buyer may call for such alternative arrangements as to payment or part payment as is considered reasonable in the circumstances
iv. The Buyer shall advise the Seller in writing of non delivery of the whole or part of the consignment within thirty days of the receipt of notice of despatch
v. The Seller shall indemnify the Buyer from and against all actions, proceedings, claims and demands made against the Buyer by any third party arising directly or indirectly out of the Seller's failure to deliver the goods on the date specified, and will also indemnify the Buyer against all loss of profits and expenses arising directly or indirectly through such non delivery
vi Incoterms 1990 shall apply to the contract, provided they are not inconsistent with any of the terms contained herein

5 QUALITY,
The Seller warrants that the goods will be of merchantable quality and fit for the purpose for which they are required by the Buyer, and if the Purchase Order contains reference to a sample and/or specification, the Seller further warrants that the goods will conform with such sample and/or specification

6 PASSING OF PROPERTY
i Subject to confirmation on acceptance of the goods shall be deemed to have taken place when they are despatched to the Buyer, the property and ownership therein shall pass to the Buyer subject to investment
ii The risk in the goods shall remain with the Seller until arrival at the delivery point
iii The fact that the Buyer may have resold, or agreed to resell any goods prior to the passing of the property or the risk shall not be deemed to operate as an acceptance of the goods

7 ACCEPTANCE
In the case of goods being delivered by the Seller not conforming with the contract, whether by reason of being of quality or in a quantity inconsistent with or unsuited or being unfit for the purpose for which they are required where such purpose has been made known in writing to the Seller, the Buyer shall have the right to reject such goods within a reasonable time of their delivery and to purchase elsewhere as near as practicable to the same contract specifications and conditions as circumstances shall permit but without prejudice to any other right which the Buyer may have against the Seller. The making of payment shall not prejudice the Buyer's right of rejection. Before exercising the said right to purchase elsewhere the Buyer shall give the Seller reasonable opportunity to replace goods with goods which conform to the Contract.

8 DEFECTS
i In the event that the Buyer notifies the Seller of any defect as aforesaid, the Seller shall be obliged to take all necessary steps to remedy the defect and in the event of any defect not being remedied within thirty days of the Buyer's notification to the Seller, the Buyer may at its sole option or remedies thereafter cancel its deemed acceptance of the goods and thereby revest all the property therein. All monies paid by the Buyer to the Seller in respect of such goods shall forthwith be refunded
ii Any goods supplied hereunder which are found to be defective in materials or workmanship or which fail to comply with the warranties given herein shall be replaced or repaired by the Seller at its own cost and expense
iii The Seller shall be responsible for all costs involved in returning goods to the Seller for repair or replacement
iv. The Seller shall indemnify the Buyer from and against all claims, proceedings, actions and demands made against the Buyer by any third party arising directly or indirectly out of such defects or out of any other breach by the Seller of the terms of the Contract and the Seller will also indemnify the Buyer against any loss of profit or expenses arising directly or indirectly out of such defects or out of any other breach of the Seller as aforesaid.

9 FREE ISSUE MATERIALS
Where the Buyer for the purposes of the Contract issues materials "free of charge" to the Seller, such materials shall be and remain the property of the Buyer. The Seller shall maintain all such materials in good order and condition subject, in the case of tooling, patterns and the like, to fair wear and tear. The Seller shall use such materials solely in connection with the Contract. Any surplus materials shall be disposed of at the Buyer's discretion. Waste of such materials arising from bad workmanship or negligence of the Seller shall be made good at the Seller's expense

10 PACKAGING
i The Seller will pack the goods suitably for delivery to the delivery point.
ii All information held by or reasonably available to the Seller regarding any potential hazards known or believed to exist in the transport, handling or use of the goods supplied shall be promptly communicated to the Buyer

11 PROTECTION AGAINST INFRINGEMENT
Supplier warrants that the supply of the Goods and the Buyer's use thereof does not infringe any patent rights, copyrights, trademarks or trade secrets owned or controlled by any third party, either in the country of manufacture or use. Supplier agrees to defend, indemnify and hold harmless Buyer and its affiliated and related companies against any and all liability, loss or expense arising out of a patent, copyright, trademark infringement or trade secret misappropriation relating to the Goods

12 SALE OF GOODS ACT.
The Seller shall indemnify the Buyer and its agents against all damages, expenses and costs arising from legal liability to any of their customers under the Sales of Goods Act in respect of any of the goods supplied under this Order except insofar as they result from fault on the part of the Buyer or its employees. The Seller agrees that this condition shall apply notwithstanding any contrary provision unless agreed specifically in writing by either party.

13 FORCE MAJEURE
If a delivery by the Seller or the acceptance by the Buyer of a delivery is delayed or prevented because the manufacture of the goods, their delivery to the Buyer's works by the usual route, or the consumption or the use of the goods by the Buyer in the ordinary course of his business, has been or is being prevented or hindered by circumstances beyond the reasonable control of either party, including any form of Government action, strikes and lockouts referred to the Contract occurs by Sub-contractors (but only where such cause were beyond the control of the Sub-Contractor concerned), such delivery shall be suspended and if it cannot be made within a reasonable time after the due date, the delivery may be cancelled by either party by letter or telex to the other. Where more than one delivery is to be made under the Contract, deliveries not cancelled will be resumed as soon as the circumstances causing the delay cease but except where both parties otherwise agree the period during which deliveries are to be made will not be extended. The Buyer shall pay the Seller such sum as may be equitable in respect of work performed prior to cancellation

14 ASSIGNMENT
The Contract shall not be assigned by the Seller or shall it sub-contract any of its obligations hereunder without the Buyer's written consent

15 INSPECTION
Buyer shall have the right to inspect the Goods, test or witness Supplier's tests of the Goods, and otherwise inspect Supplier's performance prior to delivery and acceptance of the Goods. Buyer shall exercise such right at reasonable times and in a manner which does not unreasonably interfere with Supplier's operations. Buyer's exercise of such right (including any approval of Supplier's drawings or approval of Goods for shipment) or waiver of the same shall not relieve Supplier of any of its obligations under the Order nor constitute acceptance of the Goods.

16 TITLE TO TECHNICAL DATA.
Buyer's data shall remain Buyer's property and shall be returned upon Buyer's request. All designs, drawings and calculations prepared by Supplier for Buyer shall become Buyer's property. All rights to any invention, process or technology developed for the Order shall become the Buyer's property

17 CONFIDENTIALITY OF INFORMATION.
Supplier shall safeguard, treat as confidential, and shall not divulge any of Buyer's Data to anyone other than persons designated in writing by the Buyer, so long as, and to the extent that, such Buyer's Data does not become part of the public domain, does not correspond to information furnished or made known to Supplier on an unrestricted basis by a third party, or was not within Supplier's possession at the time of disclosure
Should Supplier wish to publish or release any publicity or public relations material of any kind concerning or relating to the Order, Supplier shall first submit such material to Buyer for review. Supplier shall not publish or release, and shall ensure that its suppliers do not publish or release any such material without Buyer's approval.

18 CERTIFICATES OF ORIGIN
The Seller shall supply if reasonably required by the Buyer any necessary certificates of origin for the passage and transit of the goods to the delivery point

19 EXPORT LICENCE
Supplier shall apply for and obtain any licence required to export the Goods from the country of origin. Notwithstanding Paragraph 13, Buyer shall have the right to immediately cancel this Order without liability to Supplier if the export licence application is disapproved or unreasonably delayed in the Buyer's sole judgement

20 CANCELLATION FOR CAUSE
If Supplier commits any substantial breach of this Order, or Supplier becomes bankrupt, insolvent or unable to meet its financial obligations, Buyer may cancel the Order without liability to Supplier and without prejudice to Buyer's right to claim damages or to pursue any other remedy provided by law

21 ARBITRATION
The construction validity and performance shall be governed by the law of England and all disputes which may arise under out of or in connection with or in relation to the Contract shall be submitted to the arbitration of the London Court of Arbitration under and in accordance with its Rules at the date hereof. The parties hereto agree that service of any notice in the course of such arbitration at their address as given in the Purchase Order shall be valid and sufficient.

22 CONTINUING OBLIGATIONS
The provisions of the following paragraphs are continuing ones and their continuing binding effect shall survive the completion or cancellation of this Purchase Order: Paragraphs 8, 11, 15 and 17.

Excluding terms and conditions #'s 2, 3ii, 4i, and 4ii

Exhibit 8

Cost list A attached.  This exhibit represents the current price list as of the beginning of this contract and is, subject to change.  Any product with no price at the beginning of the contract is to be negotiated between the parties at the time subject to the terms of this agreement.

| | | Brand | Puchase Price US$ |
|---|---|---|---|
| **Bottles** | | | |
| 24101 | WN 8oz bottle with 3 flow Nuby teat and heat sensor - single | | |
| 24101 | WN 8oz bottle with bi tone med teat | | |
| 24101 | WN 8oz bottle with bi tone teat stage 2 | | |
| 24102 | WN 10oz bottle with bi tone teat | | |
| 24102 | WN 10oz bottle with bi tone teat stage 2 | | |
| 24105 | WN 9oz bottle with 3 flow Nuby teat and heat sensor - single | | |
| 24105 | WN 9oz bottle with 3 flow Nuby teat and heat sensor - triple | | |
| 24104 | Starter Kit | | |
| 1468 | Std neck 8oz natural nurser with Nuby 3 flow teat - single | | |
| 1469 | Std neck 8oz natural nurser with Nuby 3 flow teat - single | | |
| 1570 | WN Nuby bottle 9oz – single (without HS) | Tommee Tippee | 0.855 |
| 1570 | WN Nuby bottle 9oz - twin (without HS) | Tommee Tippee | 1.58 |
| 1569 | WN Nuby bottle 6oz – single (without HS) | Tommee Tippee | 0.83 |
| | WN Nuby bottle 6oz - twin with Heat Sensor | Tommee Tippee | 1.78 |
| 884 | WN No Spill Gripper Cup | Tommee Tippee | 0.65 |
| ID4310 | Std neck Nuby bottle 270ml - single BC | | |
| ID4310 | Std neck Nuby bottle 270ml - twin BC | | |
| 1407 | Std Neck Curved bottle 6 oz triple pack | | |
| 1413 | Std Neck Curved bottle 8 oz triple pack | | |
| ID 4311 | Std neck bottle with med bi tone teat 5 oz stage 2 | | |
| ID 4310 | Std neck bottle with fast bi tone teat 10 oz stage 2 | | |
| **Bottle Accessories** | | | |
| 5515 | Bottle brush with TPE. | Tommee Tippee | 0.59 |
| 5520 | Bottle brush (large wire) | | |
| 5516 | Bottle brush with TPE and sponge | | |
| **Nipples** | | | |
| 906 | WN Nuby nipple 2 pack 3 flow rates | | |
| 906 | WN Nuby nipple 4 pack 3 flow rates | | |
| 24 | Std neck Nuby nipple 2 pack 3 flow rates | | |
| 25 | Std neck Nuby nipple 4 pack formula flow (medium) | | |
| 905 | WN Nuby nipple twin pack formula flow – medium | | |
| 931 | WN Nuby nipple twin pack fast flow | Tommee Tippee | 0.49 |
| 923 | WN Nuby non spill variable flow nipple twin pack | Tommee Tippee | 0.57 |
| | Std neck Nuby non-spill variable flow nipple twin pack | Tommee Tippee | 0.53 |
| | WN Nuby nipple twin pack medium flow | Tommee Tippee | 0.43 |
| | WN Nuby nipple twin pack slow flow | Tommee Tippee | 0.49 |
| 919 | Std neck bi tone Nuby nipples medium flow - twin pack | | |
| 919 | Std neck bi tone Nuby nipples fast flow - twin pack | | |
| 24 | Std Neck Nuby teats variflow x 2 | | |
| | WN bi tine teats med x 2 | | |
| | WN bi tone teats fast x 2 | | |
| 919 | Std Neck bi tone teats med x 2 | | |
| 928 | Std neck bi tone teats fast x 2 | | |
| 4150 | Std neck ortho teats slow x 2 | | |
| 4151 | Std neck ortho teats med x 2 | | |
| | Std neck ortho teats fast x 2 | | |
| | WN bi tone non spill teat | | |
| | Std neck bi tone spill teat | | |
| | Std neck bulk slow flow teats | Mothercare | 0.1075 |
| | Std neck Slow Flow 3pk | Mothercare | 0.49 |

**Exhibit B**

|  | Std neck Medium Flow 3pk | Mothercare | 0.49 |
|  | Std neck Fast Flow 3pk | Mothercare | 0.49 |
|  | Std neck Variable Flow 3pk | Mothercare | 0.5 |

**Pacifiers**

| ID4723 | Soft shield twin pack - newborn colors |  |  |
| ID4723 | Soft shield twin pack - toddler colors plain |  |  |
| ID4723 | Soft shield twin pack - toddler colors decorated |  |  |
| 5929 | Circle shield actuating pacifier | Tommee Tippee | 0.78 |
| 5935 | Butterfly shield actuating pacifier. | Tommee Tippee | 0.80 |

| 5944? | Ice gel pacifier |  |  |
| ID4705 | Nuby Soothers 0+ size 1 bagIet MOL - bulk | Mothercare | 0.4 |
| ID4705 | Nuby Soothers 0+ size 1 bagIet MOL | Mothercare | 0.86 |
| ID4705 | Nuby Soothers 3+ size 2 bagIet LOL | Mothercare | 0.98 |
| ID4705 | Nuby Soothers 6+ size 2 bagIet LOL |  |  |
| ID 4701 | Butterfly design with soft shield and nuby bagIet small |  |  |
| ID 4701 | Butterfly design with soft shield and nuby bagIet large |  |  |
| 5932 | Actuating ortho soother | Tommee Tippee |  |

**Cups**

| 880 | No Spill cup with flip it cap 7oz |  |  |
| 882 | No Spill cup with flip it cap 9oz |  |  |
| 830 | Leak resistant straw flip lid 10 oz |  |  |
| 835 | Leak resistant straw flip lid 14 oz | Mothercare | 0.78 |
| 851 | Non Spill cup 7oz | Mothercare | 0.9 |
| 879 | Mini sipper with 2 shot lid | Mothercare | 0.66 |
| 868 | Mega sipper with lid | Mothercare | 0.69 |
| 800 | Twin handled no spill 2 shot snap on lid |  |  |
|  | Non spill tumbler with soft spot 7 oz | Boots |  |
|  | Non spill tumbler with soft spot 10 oz | Boots |  |

**Plates and Bowls**

| 5311 | Finger bowl plus new HS spoon |  |  |
| 5220 | Section plate | Mothercare |  |
| 5311 | Weaning Bowl | Mothercare |  |
| 5243 | Microwave bowl | Mothercare |  |

**Cutlery**

| 5277 | New spoons 2 pack |  |  |
| 5268 | Toddler spoon and fork - pearl colors |  |  |
| 5235 | Heat safe soft tip spoon triple pack (not heat sensitive) | Mothercare | 0.5 |
| 5244 | Soft tip spoon | Boots |  |
| 5253 | Toddler and spoon |  |  |
| 5247 | Heat sensor spoons |  |  |

**Bibs**

| 4171 | Embroidered terry bibs |  |  |
| 4114 | Teether edge bib |  |  |
| 4109 | 10 piece bib set |  |  |
| ? | Easy fasten decorated bib |  |  |

**Playthings**

| 6030 | Soft teething terry animals |  |  |
| 6070 | Plush rattle - 6 pcs in display counter box |  |  |

**Teethers**

| 454 | Teething ring | Mothercare | 0.45 |
| 456 | Fruit Teethers | Mothercare | 0.95 |
|  | Icy bite teether – elephant design | Mothercare |  |
|  | Icy bite teether – alligator design | Mothercare |  |

**Exhibit B**

Exhibit 9

Sales Projection Plan

1.      List each item Distributor plans to offer for sell for the year.
        List the projected yearly volume for each item.

        This Sales Projection plan is to be provided to LNC before the end of each

        calendar year for the next year.

**Exhibit B**