**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| LUV N' CARE, LTD. AND ADMAR INTERNATIONAL, INC., | § § § | |
| *Plaintiffs*, | § § | CASE NO. 2:14-CV-855-JRG |
| v. | § § | |
| JACKEL INTERNATIONAL LIMITED AND MAYBORN USA, INC., | § § § | |
| *Defendant*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the opening claim construction brief of Plaintiffs Luv N' Care, Ltd. and Admar International, Inc. ("Plaintiffs") (Dkt. No. 75, filed on May 14, 2015), the response of Defendants Jackel International Limited and Mayborn USA, Inc. ("Defendants") (Dkt. No. 79, filed on May 28, 2015), and the reply of Plaintiffs (Dkt. No. 80, filed on June 4, 2015). The Court held a claim construction hearing on July 7, 2015. Having considered the arguments and evidence presented by the parties at the hearing and in their claim construction briefing, the Court issues this Claim Construction Order.

**Table of Contents**

I. BACKGROUND...................................................................................................... 3

II. LEGAL PRINCIPLES .......................................................................................... 6

III. CONSTRUCTION OF AGREED TERMS ........................................................ 10

IV. CONSTRUCTION OF DISPUTED TERMS ..................................................... 10

   A. "opening" and "hole"...................................................................................... 11

   B. "valve" ............................................................................................................ 20

   C. "valve holder"................................................................................................. 23

   D. "blocking element" ........................................................................................ 28

   E. "barrier" .......................................................................................................... 32

   F. "maximum distance"....................................................................................... 35

   G. "post" .............................................................................................................. 39

   H. "wherein the relative position of said post and said opening changes"............ 43

V. CONCLUSION...................................................................................................... 45

## I. BACKGROUND

Plaintiffs bring suit alleging infringement of United States Patent No. 8,695,841 ('841 patent) by Defendants. The application leading to the '841 patent was filed on June 9, 2010, and issued on April 15, 2014. The '841 patent is entitled "No-Spill Drinking Cup Apparatus" and is directed to an "improved no-spill cup construction and valve assembly which provides an extremely secure seal against accidental liquid flow from the cup spout." The '841 patent relates to a long line of patents, all which are based on U.S. Patent No. 6,321,931 (the parent '931 patent).

The '841 patent has 2 independent claims, each of which are reproduced below:

1. An apparatus, comprising:

    (a) a no-spill drinking apparatus;

    (b) said no-spill drinking apparatus comprising a cap, said cap further comprising a spout;

    (c) said cap comprising a valve, said valve comprising a flexible material and an opening;

    (d) said apparatus comprising a blocking element next to said opening;

    (e) wherein said opening rests against said blocking element when the user is not drinking from said spout;

    (f) wherein said flexible material moves when the user sucks through said spout to drink from said spout, causing said opening and said blocking element to separate; and,

    (g) a barrier, said barrier blocking said flexible material from moving beyond a maximum distance after said flexible material moves when the user sucks through said spout to drink from said spout.

8. An apparatus, comprising:

    (a) a no-spill drinking apparatus;

    (b) said no-spill drinking apparatus comprising a cap, said cap further comprising a spout;

(c) said cap comprising a valve, said valve comprising a flexible material and an opening;

(d) said apparatus comprising a blocking element next to said opening;

(e) wherein said valve comprises a closed position in which said opening rests against said blocking element when the user is not drinking from said spout;

(f) wherein said valve comprises an open position in which said flexible material moves when the user sucks through said spout to drink from said spout, causing said opening and said blocking element to separate;

(g) a barrier, said barrier blocking said flexible material from moving beyond a maximum distance after said flexible material moves when the user sucks through said spout to drink from said spout; and,

(h) a post, wherein the relative position of said post and said opening changes when the user sucks through said spout to drink from said spout;

(i) and wherein said post extends into and through said opening in said closed position and said open position of said valve.

The '841 patent is now subject to a reissue proceeding initiated by the Plaintiffs. A motion to stay this case pending the outcome of that reissue proceeding was denied by this Court on May 15, 2015. *See* Dkt. No. 77.

## Prior Litigation

On December 12, 2011, Plaintiff Luv N' Care filed a lawsuit in the Eastern District of Texas against Koninklijke Philips NV (the Prior Texas Litigation, Case No. 2:11-cv-512) asserting infringement of five United States Patents that trace their roots to the parent '931 patent. The '931 patent had been litigated in the Western District of Louisiana (the Louisiana Litigation). In the Louisiana Litigation, the court found that the claim term "opening" from the '931 patent was not as broad as claimed because the inventors made specific disclaimers in the prosecution history of the '931 patent. In particular, the Court found that the patent (via the disclaimer) required two separate mechanisms to close off the liquid:  first, a flexible diaphragm

with an opening which stretches open when suction is applied but is closed when not stretched, and second, a blocking element against which the opening in the diaphragm rests. With much of the scope disclaimed, the Louisiana court found that the alleged product did not infringe the '931 patent. The Court, in the alternative, went on to say that "were the court not to construe the patent in this manner, then the invalidity of the Hakim patent '931 is assured." *Hakim v. Cannon Avent Grp., PLC*, No. CIV.A. 3-02-1371, 2005 WL 1793760, at *6 (W.D. La. May 4, 2005). On appeal, the Federal Circuit affirmed the underlying district court opinions and provided additional analysis. *See Hakim v. Cannon Avent Group, PLC*, 479 F. 3d 1313 (Fed. Cir. 2007). The Federal Circuit stated that "during prosecution the presence of the slit in the flexible valve material was emphasized as distinguishing all of the claims from the cited references." *Id.* at 1316. In contrast, the accused product had "a valve with a flexible diaphragm having a central opening, but the opening is not a slit that opens and closes, but simply a hole in the diaphragm." *Id.* The Federal Circuit rejected Hakim's arguments that the district court's construction "excessively constricted" the claims of the '931 patent because they allegedly "do not require a slit that opens and closes with pressure, for claims 1 and 2 use the word 'opening,' not 'slit,' for the aperture in the diaphragm." *See id.* at 1316. The Federal Circuit held that the term "'opening' [in the '931 patent] is not correctly construed to eliminate the sealing mechanism provided by the slitted diaphragm." *Id.* at 1318.

The inventor of the '931 patent applied for and was granted several child patents, five of which were at issue in the Prior Texas Litigation and one of which (the '841 patent) is at issue in the current action. Magistrate Judge Payne issued a claim construction ruling in the Prior Texas Litigation on July 9, 2013 (the Prior Order, *see* 2:11-cv-512, Dkt. No. 167) finding among other things that the same disclaimer concerning the parent '931 patent from the Louisiana Litigation

was not rescinded, but applied to the five child patents in that lawsuit. This disclaimer led the Plaintiff Luv N' Care to concede that the accused product did not infringe under the Court's interpretation. In the Prior Texas Litigation the parties filed a Joint Motion for Entry of Judgment of Non-Infringement, and the Plaintiff Luv N' Care appealed the Court's claim construction ruling to the Federal Circuit. On December 11, 2014, the Federal Circuit disagreed with Luv N' Care and affirmed the judgment of this Court under Rule 36. *See Luv N' Care Ltd. v. Philips Electronics N. Am. Corp. et al.*, Case No. 2014-1007 (Fed. Cir. December 11, 2014).

The claim term "opening"—and the accompanying disclaimer in the '931 patent—are at the heart of the current dispute. Plaintiffs contend that the disclaimer (and claim limitation) found in the parent '931 patent was rescinded during the prosecution of the child patents, and particularly during the prosecution of the patent in issue in this case, the '841 patent.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See id.* at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the

entire patent. *Phillips*, 415 F.3d at 1312-13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314-15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns,*

*Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The "determination of claim indefiniteness is a legal conclusion that is drawn from the Court's performance of its duty as the construer of patent claims." *Exxon Research & Eng'g Co.*

*v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Section 112 entails a "delicate balance" between precision and uncertainty:

> On the one hand, the definiteness requirement must take into account the inherent limitations of language. Some modicum of uncertainty, the Court has recognized, is the price of ensuring the appropriate incentives for innovation. . . . At the same time, a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them. Otherwise there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims. And absent a meaningful definiteness check, we are told, patent applicants face powerful incentives to inject ambiguity into their claims. . . . Eliminating that temptation is in order, and the patent drafter is in the best position to resolve the ambiguity in patent claims.

*Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2128-29 (2014) (citations omitted).

Therefore, in order for a patent to be definite under § 112, ¶ 2, "a patent's claims, viewed in light of the specification and prosecution history, [are required to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.* at 2129. The determination of "definiteness is measured from the viewpoint of a person skilled in the art at the time the patent was filed." *Id.* at 2128. (emphasis original, citations omitted). "The definiteness requirement . . . mandates clarity, while recognizing that absolute precision is unattainable." *Id.* This standard reflects rulings that have found that "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." *Id.* at 2129. "Whether a claim reasonably apprises those skilled in the art of its scope is a question of law that [is] review[ed] de novo." *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008). As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *Nautilus*, 134 S. Ct. at n.10.

## III. CONSTRUCTION OF AGREED TERMS

The Court hereby adopts the following agreed constructions:

| Term | Agreed Construction |
|---|---|
| "drinking apparatus" | Plain and Ordinary Meaning |
| "cap" | Plain and Ordinary Meaning |

(*See, e.g.*, June 11, 2015 Joint Claim Construction Chart, Dkt. No. 82-1.)

## IV. CONSTRUCTION OF DISPUTED TERMS

As indicated above, this is not the first opportunity for a court to construe terms related to the '841 patent. Although the disputes in this case present many of the same issues that have already been resolved before, the Court still carefully considered all of the parties' arguments (both the new and repeat arguments) in construing the claims in this case. *See Burns, Morris & Stewart Ltd. P'ship v. Masonite Int'l Corp.*, 401 F. Supp. 2d 692, 697 (E.D. Tex. 2005) (describing that although a previous construction may be instructive and provide the basis of the analysis, particularly when there are new parties and those parties have presented new arguments, the previous construction is not binding on the court). As indicated by *Burns*, however, any previous constructions are instructive and will at times provide part of the basis for the analysis. *See id.*

When the Court considers a prior claim construction, the Court considers that different parties may raise different arguments and may highlight different evidence. Sometimes the Court adopts the prior construction, and other times the Court reaches a different conclusion. The Court therefore turns to an analysis of the evidence and arguments presented in the parties' briefing and at the July 7, 2015, hearing. The parties' positions and the Court's analysis as to the disputed terms are presented below.

## A. "opening" and "hole"

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "opening" ('841 Patent: claims 1, 5, 8, 12) | "an aperture or orifice creating a passageway" | "a self-sealing opening in the flexible valve material that closes when suction is not applied" |
| "hole" ('841 Patent: claims 5, 12) | "an opening wherein there is an open space" | "a self-sealing hole in the flexible valve material that closes when suction is not applied" |

The disputed term "opening" appears in claims 1, 5, 8, and 12 of the '841 patent. The disputed term "hole" appears in claims 5 and 12 of the '841 patent.

### (1) The Parties' Positions

Plaintiffs submit that the "opening" and "hole" terms have their plain and ordinary meanings. (*See, e.g.*, Dkt. No. 75 at 19.) Defendants' constructions are based on a disclaimer from a parent application, but Plaintiffs argue that the claim language is different (which is one reason not to apply a disclaimer) and the disclaimer has been rescinded. (*Id.*) According to Plaintiffs, regarding the "opening" term, the claim language contains no limitation on the type, shape, or location of the opening, nor does it require the opening to be in the flexible material. (*Id.*) The Plaintiffs also contend the claim simply requires a valve having a flexible material and an opening, which is different from saying that the valve comprises a flexible material and an opening in the flexible material. (*Id.* at 19-20.) The specification and prosecution history of the '841 patent provides broad guidance to the term "opening." (*Id.* at 20.) Plaintiffs argue that no prosecution disclaimer from the parent patent application that matured into the '931 patent applies to the '841 patent. (*Id.* at 23.) First, Plaintiffs argue that any disclaimer was rescinded by the Applicant during prosecution of the '841 patent—the Applicant made specific statements to

the USPTO regarding the broad language of the terms and that any disclaimers did not apply. (*Id.* at 23-27.) Plaintiffs argue that the Examiner considered all of the cited prior art and did not apply any disclaimer to the terms. (*See id.*) Second, even without a rescission, Plaintiffs argue that no disclaimer would apply to the '841 patent. (*Id.* at 28-30.) Plaintiffs argue that because the claim language of the '841 patent is materially different than the claim language related to the disclaimers in the parent application, that the disclaimer does not apply. (*Id.*) Further, because the claims add a "post" limitation to the claims and patent that was not included in the earlier parent application (it was added in a continuation-in-part application) and that directly contradicts the prior disclaimer, Plaintiffs argue that the prior disclaimer does not apply. (*Id.* at 29.) Because the opening as claimed requires a post to protrude through the opening even in a closed position, the opening cannot seal against itself. (*Id.* at 30.) Thus, according to Plaintiffs, only a single closing mechanism is used in the embodiment where the post fills the opening. (*Id.*)

Defendants argue that the question is simply whether the Applicant has rescinded the disclaimer in accordance with Federal Circuit law. (*See, e.g.*, Dkt. No. 79 at 1.) Defendants argue that the Applicant never acknowledged the disclaimer was made or found to exist in litigation, never told the PTO exactly what prior art was at issue during the previous disclaimer, and never specifically asked the PTO to revisit that art in light of the supposed rescission. (*Id.*) Defendants argue that the claim language in the '841 patent is not materially different from the language in the prior patents because they all recite a valve comprising a flexible material, an opening, and a blocking element, and when the valve is open the opening separates from the blocking element. (*Id.*) Defendants argue that even though the opening is not specifically claimed to be in the flexible material that this is not a material difference because (i) the claims should be construed to require that the opening be in the flexible material and (ii) the claim language does not

preclude the opening from being in the flexible material. (*Id.* at 8.) Thus, overall, there is no material difference between the different patents according to the Defendants. (*Id.*) Defendants argue the "two part sealing mechanism" disclaimer is not inconsistent with the "post" limitation because the opening can close upon the base of the protruding member to seal itself. (*Id.* at 8.) Further, Defendants argue that the prior disclaimer has not ben properly rescinded. (*Id.* at 9.) In particular, Defendants argue that Applicant failed to acknowledge the prior disclaimer, failed to state explicitly that two district courts have found the prior disclaimer, and failed to put the Examiner on notice of the prior art patents that may need to be re-visited. (*Id.* at 9-12.) According to Defendants, any unrecorded examiner interview does not provide notice or clarity in the prosecution record for proper rescission of a disclaimer. (*Id.* at 13.) Defendants argue that Plaintiffs' filing of a reissue application on the '841 patent is proof that no rescission was made. (*Id.*) Specifically regarding the term "opening," Defendants argue that to be able to stretch open and self-seal, the opening must necessarily be made of, or in, the flexible material. (*Id.* at 14.) Further, the only disclosed embodiments in the specification have the opening in the flexible material and the claims should be similarly limited. (*Id.*) Specifically regarding the term "hole," Defendants argue that it is likewise limited by the prior disclaimer and the only disclosed embodiments put the hole in the flexible valve. (*Id.* at 15.)

Plaintiffs reply that the reissue application is not the result of any prosecution defect and is not proof that there was no rescission in the '841 patent. (*See, e.g.*, Dkt. No. 80 at 1.) According to Plaintiffs, Defendants ignore applicable case law suggesting that materially different claim language may remove a prior disclaimer even where the new claim permits the limitations of the previously disclaimed subject matter. (*Id.* at 3.) Plaintiffs argue that claims specific to the "post" embodiment did not exist when the disclaimer occurred, so it certainly

cannot be clear and unequivocal that the applicant disclaimed a future embodiment's features. (*Id.* at 4.) Plaintiffs argue that to be self-sealing, an opening must seal itself, but an opening cannot close itself when a post blocks the closure. (*Id.*) Plaintiffs argue that the prior parent disclaimer has been properly rescinded and that statements during prosecution were "sufficiently clear to inform the examiner that the previous disclaimer and the prior art it was made to avoid may need to be revisited," which is all that is required by Federal Circuit precedent. (*Id.* at 6.) Plaintiffs argue that the prior art related to the prior disclaimer was resubmitted to the Examiner, the district court cases were specifically identified to the Examiner as relating to disclaimer and claim scope, and the Examiner expressly confirmed in writing that he reviewed them. (*Id.*) Plaintiffs argue that these submissions satisfy any public notice function related to the Federal Circuit's rescission doctrine. (*Id.*) Regarding the specific "opening" and "hole" limitations, Plaintiffs argue that any limitations based on an embodiment is incorrect where those limitations are not recited in the claims. (*Id.* at 7.)

### (2) Analysis

In the Prior Texas Litigation, the term "opening" was construed to mean an "opening that closes when suction is not applied," and the term "hole" was construed to mean a "hole that closes when suction is not applied." (*See* Prior Order at 9.)

The parties' primary dispute here is whether a prosecution history disclaimer applies. There seems to be no disagreement that absent a disclaimer, the terms have their plain and ordinary meaning. Further, there seems to be no disagreement that the claims and the specification do not specifically limit the terms to the constructions proposed by the Defendants. Further, there is no dispute that the prosecution history of the '841 patent itself does not support Defendants' constructions. In other words, Defendants' constructions are based solely on a

prosecution history disclaimer from a parent application to the '841 patent. Whether this disclaimer applies to these terms include two separate but related issues: (1) does a disclaimer apply to these claims from the parent application and, (2) if it does, was the disclaimer rescinded?

### Has There Been a Proper Rescission?

Assuming that the disclaimer in the parent patent is applicable to the '841 patent, the Court must determine whether there was proper rescission. For the reasons below, the Court finds that, overall, the Applicant has informed the Examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited, as required by the Federal Circuit to recapture previously disclaimed scope. *See Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1318 (Fed. Cir. 2007). Thus, whether or not the disclaimer from the parent application were to apply to the '841 patent, the Court finds that any such disclaimer was rescinded.

During prosecution of the '841 patent, the Applicant made various statements to the Patent & Trademark Office regarding the meaning of the terms and any potential disclaimers. On March 9, 2012, the Applicant made the following statement:

> Also, as discussed in various parent applications, it is requested that all of the claims in this application be interpreted on the basis of the language set forth in them and the broadest reasonable interpretation thereof in view of the specification. No limitations or prosecution disclaimers on the language of the claims should be imported into any claim from earlier prosecution or prior versions of the claims or prior patents, and it will be assumed that no such importing is being conducted unless a statement is made by the PTO that it is doing so.
>
> For example, it is noted that, in the independent claims, any opening can be used. In particular, the opening does not have to be a slit but can be any hole.[2] Likewise, any type or shape post can be used, or so forth. Any prior disclaimers, or alleged disclaimers, during prosecution should be deemed rescinded herein. It is submitted that all of the claims are currently in fully allowable form as the

language stands in the claims themselves, without any further limitations or disclaimers thereon.

[FN2] For example, in a Prior Texas Litigation Defendants alleged a restrictive meaning to the word "opening", alleging that the opening must have self-sealing characteristics, like a slit. No such restrictive meaning is or was intended by Applicant. Accordingly, the term opening includes any opening of any kind, without requiring any sealing characteristics or other special characteristics. No limitation is intended on the type or size of the opening, or in any other manner, nor should any limitation be placed on it.

(Mar. 9, 2012 Amendment and Response to Office Action at 7.)

On October 18, 2012, the Applicant submitted various prior art references, notes various pending litigations, and made the following statement regarding claim construction:

As previously noted in prior submissions, any and all disclaimers in this application or any applications related hereto have been rescinded by applicant. Accordingly, the claims should be interpreted such that any type of opening can be used, any type or shape of post can be used, the opening does not need to seal on the post, and so forth.

(Oct. 18, 2012 Response to Office Action at 12.)

These statements were found by this Court in the Prior Texas Litigation to be generic statements that do not rise to the level required by the Federal Circuit to rescind a prior disclaimer, which was affirmed by the Federal Circuit. The patentee did not specifically point out that he no longer intended to be limited to the specific mechanism that he had previously argued was the distinguishing feature of his invention. At no point did the patentee re-argue the prior art references that required the original disclaimer in the prior patent or request the Examiner to revisit the specific prior art. The patentee's statements were not "sufficiently clear to inform the examiner that the previous disclaimer . . . may need to be revisited," and the statements were not "sufficiently clear to inform the examiner" that the prior art needs to be re-visited. (*See id*.) At a minimum, patentee's statements were not "sufficiently clear" to rescind its prior disclaimer. The

Federal Circuit affirmed this Court's judgment without opinion under Rule 36. The Court again finds that these statements are not "sufficiently clear" to rescind the prior disclaimer under Federal Circuit law.

However, subsequent to the Prior Order of July 9, 2013, the Applicant filed a Request for Continued Examination (RCE) on October 29, 2013, in which numerous prior art references were cited and the Applicant stated that this Court construed various terms and decided issues of disclaimer and rescission:

> Luv n' care, Ltd. ("LNC"), of which the present Inventor Mr. Nouri E. Hakim is the CEO, is the owner of the family of patents and patent applications of which the present application is a member. LNC has been involved in a patent infringement litigation concerning five (5) of the issued patents related to the present application, namely, U.S. Patent Nos.: 7,204,386; 7,243,814; 7,789,263; 7,789,264; and RE43,077 (hereinafter, collectively, the "Related Patents"). That litigation is styled: *Luv n' care, Ltd. v. Koninklijke Philips Electronics N.V.*, et al., 2:11-cv-00512-JRG-RSP (E.D. Tex.) (hereinafter, "Philips Litigation").

> In the Philips Litigation, following written briefing by the parties as to their respective claim constructions on a number of claim terms in the asserted claims of the Related Patents, a Markman hearing was held on March 21, 2013, after which LNC submitted additional evidence to the Court to support its claim construction positions. The Court issued its claim construction Memorandum and Order on July 9, 2013 (hereinafter, "CC Order."). In particular, the CC Order construes claim terms, such as "opening," "hole," "post," "barrier," and "blocking element" that appear in the pending claims in the present application, and the issues of a disputed claim construction disclaimer and rescission of such disclaimer by Mr. Hakim in connection with earlier patents in the same family as both the Related Patents and the present application. LNC is currently in the process of appealing the CC Order to the U.S. Court of Appeals for the Federal Circuit.

> The parties' claim construction briefs and joint claim construction statement, as well as the Markman Hearing Transcript and the CC Order are included in the present IDS. Applicant respectfully requests the Examiner's review and consideration of these litigation documents, as well as the prior Federal Circuit decision in *Hakim v. Cannon Avent Group, PLC*, 429 F. 3d 1313 (Fed. Cir 2007), in connection with the scope and allowability of the pending claims in the present application.

Counsel welcomes the opportunity to discuss these issues with the Examiner at an in-person interview, and thanks the Patent Office for its consideration of these matters.

(Oct. 29, 2013 Request for Examination at 3-4.) The Examiner and the Applicant held an in-person meeting on November 25, 2013, and discussed the pending claims and three specific prior art references (Belcastro, Robbins, and Bachman et al.). *See, e.g.*, Dec. 4, 2013 Interview Summary. Further, the lack of a self-sealing aspect of the hole was specifically discussed, as acknowledged in an Interview Summary issued by the Examiners:

Counsel and Examiners discussed current claims as well as claims of parent patents ('931, '620, '386, '814, '263, '264, and '077 Reissue) and associated file wrappers. Examiners Kirsch and Hicks determined any disclaimers treated as rescinded from '386 and '814 forward, wherein the parent claims and all references therein including the art of record from '931 were examined based upon any kind of hole without requiring self-sealing. Patentee's statements with respect to claim terms (opening, orifice, hole, etc) were considered and applied in patents '386, '814 and forward.

(*Id.*)

The Court finds that the statements, particularly the statements by the Examiners, but also the actions and statements taken by the Applicant, in the '841 patent, subsequent to the issuance of the Prior Order, are enough to rescind the prior disclaimer. As the Federal Circuit in *Hakim* stated, "[a]lthough a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be *sufficiently clear to inform the examiner* that the previous disclaimer, and the prior art that it was made to avoid, may need to be revisited." *Hakim*, 479 F.3d at 1318 (emphasis added). Pursuant to Federal Circuit law, the Court finds that the evidence shows that the statements were "sufficiently clear to inform the examiner" under Federal Circuit law. While Defendants argue that any such interview was private and did not provide the public with notice as to the rescission and the Applicants' statements lacked the

required specificity, the <u>Examiner's</u> summary of the interview provides sufficient clarity that the opening was examined without any requirement for a self-sealing characteristic and that prior disclaimers were treated as rescinded. The Examiners were informed that the prior art may need to be re-visited and knew there was a specific disclaimer regarding a self-sealing hole. The Court expressly notes that this finding is only for the '841 patent.

Thus, to the extent that the prior disclaimer is applicable to the '841 patent, the Court finds that there was sufficient rescission.

**<u>Construction</u>**

As mentioned above, there appears to be no dispute between the parties that, absent a disclaimer, the plain and ordinary meaning of these terms applies. A plain and ordinary meaning construction is consistent with the claims and the specification of the '841 patent. For example, there are no specific limitations in the claims that would limit the "hole" and "opening" terms to the constructions proposed by the Defendants. Further, the specification is clear that any form of an "opening" can be utilized in the valve, and the "opening 70 can be, for example, a slit, a slot, an orifice, a hole, or so forth." (*See, e.g.*, '841 patent, col. 10, ll. 16-20.) As in the Prior Order, the fact that the '841 patent uses separate terms for a hole and opening in both the specification and claims implies that they have different (however small) meanings.

The Court finds that the terms "opening" and "hole" have their plain and ordinary meanings. The Court rejects Defendants' proposals. Plaintiffs' constructions attempt to give the plain meaning to these terms, but are nothing more than simple recitations taken from a dictionary. The Court finds that these are simple terms and that no further clarification is necessary. Because this resolves the dispute between the parties (in particular, whether prosecution history disclaimer applies), the Court finds that the terms require no further

construction. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." (*citing U.S. Surgical*, 103 F.3d at 1568)).

**The Court hereby construes "opening" to have its plain meaning. The Court hereby construes "hole" to have its plain meaning.**

**B. "valve"**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a device to control and/or impede the flow of a fluid" | "an invertible flexible membrane for controlling the passage of fluid in one direction" |

The term "valve" appears in claims 1 and 8 of the '841 patent.

**(1) The Parties' Positions**

Plaintiffs submit that the term "valve" has its plain and ordinary meaning. (*See, e.g.*, Dkt. No. 75 at 9.) Plaintiffs argue that the claim specifies that the valve comprises a flexible material and an opening. (*Id.*) The claim language contains no limitation on the type or construction of the valve beyond requiring it to include a flexible material and an opening. (*Id.*) The claim does not recite where the opening must be located. (*Id.*) Plaintiffs' construction is allegedly supported by various dictionary definitions. (*Id.* at 10.)

Defendants argue that the valve must be made of flexible material based on a prosecution history disclaimer argument. (*See, e.g.*, Dkt. No. 79 at 15.) Defendants argue that the Applicant

distinguished his invention on the basis that it utilizes two separate mechanisms to close off the passage of liquid through the valve: (1) a flexible diaphragm with an opening that stretches open when suction is applied but is closed when not stretched, and (2) a blocking element against which the opening in the diaphragm rests. (*Id.* at 15-16.) Defendants argue that while the claim language only claims a valve with a flexible material and an opening, that the prosecution history disclaimer requires the opening to be in the flexible material, which is supported by the specification in which every single valve embodiment is a flexible material. (*Id.* at 16.) Defendants further argue that the valve controls fluid passage in one direction only because the whole purpose of the patent is to invent a no spill drinking apparatus that prevents liquid from flowing out of the cup when not desired, and having a bi-directional valve would defeat the point of this invention. (*Id.*) Defendants also argue that the valve must be invertible because the valve's ability to invert is precisely the quality that makes it spill-proof. (*Id.*)

Plaintiffs reply that Defendants' construction is solely based on a prosecution history disclaimer argument, and argues that any disclaimer made in prior patents does not apply. (*See, e.g.*, Dkt. No. 80 at 7.) Plaintiffs argue that absent a clear indication for a limitation in a claim that no such limitation should be read into the claims. (*Id.*) The Plaintiffs argue there is no clear indication that a hole must be in a flexible membrane. (*Id.*) Further, using an invertible flexible membrane is just one way to configure a valve. (*Id.* at 8.) The broader claim term flexible member must not be limited to a species using an invertible flexible member, according to the Plaintiffs. (*Id.*)

## (2) Analysis

In the Prior Texas Litigation, "valve" was construed to have its plain and ordinary meaning. (*See* Prior Order at 21.) In this litigation, the parties dispute whether plain and ordinary meaning applies.

The claim language clearly specifies that the valve comprises a flexible material. Defendants' inclusion of the "flexible membrane" phrase for the valve would make the subsequent claim language superfluous and/or redundant, which is rarely correct. Regarding the remaining disputes, the Court finds no requirement in the claims that the valve and/or flexible membrane be inverted. While the parties seem to agree a valve controls the passage of fluid in one direction, the Court is not convinced that the inclusion of this phrase for the term's construction is necessary or helpful to the jury. Defendants' arguments on these issues are impermissible attempts to read limitations from the specification into the claims. The Court finds that there is no basis to do so. The Court finds that the examples in the specification are non-limiting embodiments of the invention that should not be imported into the claims. The Federal Circuit has consistently held that "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water,* 381 F.3d at 1117. Even where a patent describes only a single embodiment, absent a "clear intention to limit the claim scope," it is improper to limit the scope of otherwise broad claim language by resorting to a patent's specification. *Id.*; *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (citing numerous cases rejecting the contention that the claims of the patent must be construed as being limited to the single embodiment disclosed and stating that claims are to be given their broadest meaning unless there is a clear disclaimer or disavowal); *Comark Commc'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed. Cir. 1988) ("Although the

specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."); *Phillips*, 415 F.3d at 1323.

The Court finds that the term "valve" has no special meaning other than its plain meaning. The specification and claim language makes clear that the valve is simply a device used to control the flow of fluid, which is the plain meaning of the term "valve." The Court rejects Defendants' arguments to the contrary. Further, this is the construction previously determined by the prior claim construction. Because this resolves the dispute between the parties, the Court finds that the term requires no further construction. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.") (*citing U.S. Surgical*, 103 F.3d at 1568).

**The Court hereby construes "valve" to have its plain and ordinary meaning**.

**C. "valve holder"**

| Plaintiffs'<br>Proposed Construction | Defendants'<br>Proposed Construction |
|---|---|
| "a structure that supports and retains the valve in place" | "a structure, separate from the valve, that secures the valve to the cap" |

The disputed term "valve holder" appears in claims 6 and 13 of the '841 patent.

### **(1) The Parties' Positions**

Plaintiffs submit that the term "valve holder" has its plain and ordinary meaning. (*See, e.g.*, Dkt. No. 75 at 15.) Plaintiffs argue that the claim language only requires the valve holder to be (a) separable from the cap and (b) sized to fit snugly into said cap. (*Id.*) Plaintiffs argue that additional limitations to the valve holder are both improper and redundant. (*Id.* at 16.) Plaintiffs also rely on the specification, which discloses that the valve holder "secures or encapsulates a valve tightly therein, maintaining the valve in place in the valve holder," and that such disclosures do not require the valve holder be "separate" as argued by the Defendants. (*Id.*)

Defendants argue that its construction is not duplicative of the claim language because being separable from the cap is a different concept than the valve holder being a separate component from the valve. (*See, e.g.*, Dkt. No. 79 at 25.) Defendants contend that the issue as to whether the claimed valve is a separate structure than the claimed valve holder is an important question for the Court to resolve. (*Id.*) Defendants argue that the accused products do not have a separate valve holder and the accused valve assembly is also the accused valve holder. (*Id.* at 25-26.) Because the inventor claimed two separate components of the apparatus—a valve and a valve holder—they are presumed to mean different things. (*Id.* at 26.) Further, the valve holder term itself implies that it is a separate structure because it is a device that holds a valve in place, not a device that is also itself a valve. (*Id.* at 27.) Still further, the Defendants argue that the patent specification repeatedly describes the valve holder as a component separate from the valve. (*Id.* at 27-28.)

Plaintiffs reply that they are not contending that a "valve" and a "valve holder" have the same scope. (*See, e.g.*, Dkt. No. 80 at 9-10.) The fact that different claim elements have different scope does not preclude the possibility that respective parts of the same structure of an accused

product may correspond to different claim elements. (*Id.* at 10.) Plaintiffs argue that different claim elements need not be found in separate structures of an infringing device and that the structure of one infringing element may also contribute to the structure of another infringing element. (*Id.*) Plaintiffs argue that while part of the "valve" and the "valve holder" may both reside in the plastic structure, they do not encompass the same claim scope. (*Id.*)

**(2) Analysis**

The parties' dispute two issues: whether the valve holder is a separate structure and whether it secures the valve to the cap.

The relevant claim language, found in claims 6 and 13, is straightforward and claim 6 is reproduced below:

> An apparatus as claimed in claim 1, wherein said apparatus further comprises a **<u>valve holder</u>**, said valve holder being separable from said cap and being dimensioned to fit snugly into said cap.

(emphasis added). Claim 1 claims a cap that comprises a spout and a valve. Claim 6 is clear that the valve holder is separable from the cap and is dimensioned to fit snugly into the cap. Claim 6 does not expressly state that the valve holder is separate from the valve. Nor does claim 6 expressly state that the valve holder secures the valve to the cap.

The simple meaning of a "valve holder" is a device that holds a valve. In other words, a valve holder is a structure that holds, maintains, or secures the valve in place. This plain meaning is also consistent with the specification:

> As shown in FIGS. 1 and 2, no-spill cup 7 further includes **valve holder** or assembly 31. **Valve holder** 31 is preferably constructed from a high temperature ABS material, and is dimensioned to fit snugly into cap 11. In the preferred embodiment, **valve holder** is a separate assembly which fits into cap 11. Alternatively, the **valve holder** can be provided as an integral part of cap 11 and/or cup 7. For example, **valve holder** 31 can be molded as a part of cap 11, such that the **valve holder** is inseparable from the cap.

> FIG. 3 is an enlarged, exploded, perspective view of the **valve holder** of the present invention. **Valve holder** 31 consists of two valve holder subunits 37 and 39, connected by a bridge 34. **Each valve holder subunit is intended to hold a single valve therein.** As shown in the figure, valve or valve member 42 is intended for placement in subunit 37, and valve or valve member 45 is intended for placement in subunit 39. Valves 42 and 45 each include a slit or orifice for the passage of liquid. The slit or orifice is preferably through the center portion of the valve, and is dimensioned to allow a predetermined flow level or rate of liquid therethrough, as desired.

('841 patent, col. 6, ll. 33-41; col. 6, l. 60 – col. 7, l. 3))(emphasis added). Thus, in one embodiment, the valve holder is a separate assembly that may be inserted into the cap, and in other embodiment the valve holder is integral and/or inseparable from the cap. The specification has repeated references that the valve is inserted into the valve holder. *See, e.g.,* col. 6, ll. 61-66; *c*ol. 7, ll. 20-22 and ll. 29-31. As argued by Defendants, each embodiment of the specification is clear that the valve holder is a separate structure from the valve and is intended to hold the valve. "When closed, each [valve holder] subunit secures or encapsulates a valve tightly therein, maintaining the valve in place in the valve holder." *Id.* at col. 7, ll. 29-31. Indeed, the Plaintiffs do not dispute this fact, but simply argue that the claim term is not limited to a preferred/sole embodiment of the specification.

The question then presented to the Court is whether the valve holder, as claimed, must be a separate device. Overall, based on the claim language, the term "valve holder," and the specification, the Court finds that the valve holder and valve need not be separate items. First, at no point does the claim state that the valve holder holds the valve *within* the valve holder or that the valve and valve holder are separate items. If the applicant had wanted to make the items separate, it could have easily done so in the claim language. Second, the ordinary meaning of the term "valve holder" is simply a device that holds a valve. It does not require the valve to be within the valve holder or that the valve be a separate device from the valve holder. There may

be embodiments where a valve can be attached to a valve holder, where a valve and valve holder are part of a single structure, or where a valve and valve holder are separate structures such that the valve is contained within the valve holder. Third, the Court finds that there are no limitations or disclaimers in the specification or prosecution history that would require a finding that a valve and valve holder must be separate structures. While there are embodiments in the specification that show separate valves and valve holders, embodiments alone do not rise to the level required to limit a valve holder to a separate device. The Court finds that the examples in the specification are non-limiting embodiments of the invention that should not be imported into the claims. The Federal Circuit has consistently held that "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water,* 381 F.3d at 1117. Even where a patent describes only a single embodiment, absent a "clear intention to limit the claim scope," it is improper to limit the scope of otherwise broad claim language by resorting to a patent's specification. *Id.*; *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (citing numerous cases rejecting the contention that the claims of the patent must be construed as being limited to the single embodiment disclosed and stating that claims are to be given their broadest meaning unless there is a clear disclaimer or disavowal); *Comark Commc'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed. Cir. 1988) ("Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."); *Phillips*, 415 F.3d at 1323.

Lastly, the Court finds that Defendants' proposed phrase of "that secures the valve to the cap" is unnecessary. The claim requires the valve holder to fit snugly into the cap, and because the valve holder inherently holds the valve, by implication the valve holder indirectly secures the

valve to the cap. However, this additional limitation does not provide meaning to the term itself (a valve holder) as opposed to the implicit interactions of various components in the claims and the Court does not find that its inclusion is necessary or helpful to an understanding of this term.

The Court finds that the term "valve holder" has no special meaning other than its plain meaning. Because this resolves the dispute between the parties, the Court finds that the term requires no further construction. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.") (*citing U.S. Surgical*, 103 F.3d at 1568).

**The Court hereby construes "valve holder" to have its plain meaning.**

### D. "blocking element"

| Plaintiffs'<br>Proposed Construction | Defendants'<br>Proposed Construction |
|---|---|
| "a physical structure that blocks, obstructs, or impedes the opening" | "a stationary structure that seals against fluid flow" |

The disputed term "blocking element" appears in claims 1 and 8 of the '841 patent.

### (1) The Parties' Positions

Plaintiffs submit that the term "blocking element" has its plain and ordinary meaning. (*See, e.g.*, Dkt. No. 75 at 11.) Plaintiffs argue that Defendants' construction adds imported limitations from the specification. (*Id.*) If the inventor meant to require the blocking element to

be stationary, he could have included that word in the claim, but he did not. (*Id.*) There is nothing in the claim language that requires the blocking element to be stationary. (*Id.*) While the preferred embodiment shows that center stop 52 is stationary, that aspect of the center stop/blocking element is not specifically claimed. (*Id.* at 12.) Further, the plain meaning of the term does not dictate whether the blocking element is movable or not. (*Id.*)

Defendants argue that the Plaintiff agreed in the Prior Texas Litigation that a "blocking element" is a structure that "seals against fluid flow" and should be estopped from arguing otherwise now. (*See, e.g.*, Dkt. No. 79 at 20.) Thus, the remaining dispute is whether the blocking element is "stationary." (*Id.* at 21.) In the only embodiment disclosed in the specification, the blocking element/center stop is stationary, according to the Defendants. (*Id.*) And, because no other blocking element is taught in or enabled by the specification, it is perfectly appropriate to limit the claims to what the inventor actually invented. (*Id.* at 21-22.)

Plaintiffs reply that it is improper to read a limitation into the claims absent lexicography or disclaimer. (*See, e.g.*, Dkt. No. 80 at 9.) Here, Defendants have been unable to identify any and there is nothing in the claims that require the blocking element to be stationary. (*Id.*)

**(2) Analysis**

In the Prior Texas Litigation, "blocking element" was agreed by the parties to mean "a structure that seals against fluid flow." (*See* Prior Order at 8.)

The parties dispute whether plain and ordinary meaning applies or whether the term is limited to the preferred embodiment. The parties' dispute two primary issues: (i) whether the term must "seal against fluid flow," and (ii) whether the term must be "stationary."

The term "blocking element" is found in claims 1 and 8 and the relevant claim language is reproduced below:

(d) said apparatus comprising a **<u>blocking element</u>** next to said opening;

(e) wherein said opening rests against said **<u>blocking element</u>** when the user is not drinking from said spout;

(f) wherein said flexible material moves when the user sucks through said spout to drink from said spout, causing said opening and said **<u>blocking element</u>** to separate;

(claim 1, emphasis added).

The specification provides some guidance as to the blocking element term:

Center stop 52 functions as a sealing member or **<u>blocking element</u>** of the valve assembly which seals off and blocks the flow of fluid through the valve. In one embodiment, center stop 52 consists of a solid substantially flat central area or portion 56 which is impenetrable to the flow of liquid therethrough. In a further, preferred, embodiment, center stop or seal off 101 is provided with a protruding member 108 extending off of the base of the center seal off, as shown in FIG. 15.

When in the normal resting position, valve 42 relaxes to sit securely against the **<u>center stop 52</u>**, as shown in FIG. 8(d). In this resting position, opening or orifice 70 of valve 42 presses firmly against the central area 56 of center stop 52, preventing any fluid flow through the valve, and maintaining the valve in a closed configuration. In an alternate embodiment, the orifice can sit firmly against and upon a protruding member 108, as shown in FIG. 15.

FIGS. 7 and 8, for example, show a preferred bowl shape for the flexible material of the valve 42. FIGS. 8(d) and 8(e) show the valve before and after it inverts, with FIG. 8(d) showing the valve assembly not in use, with no negative pressure applied, and with FIG. 8(e) showing the valve assembly in use, with negative pressure applied to the valve. As shown therein, upon application of negative pressure the bottom (distal side) of the bowl and the opening in that bottom move away from the **<u>blocking element</u>**, toward the top (proximal side) and rim of the bowl, and toward the spout, allowing liquid to exit through the opening.

('841 patent, col. 7, ll. 45-53; col. 7, l. 63 – col. 8, l. 3; col. 8, ll. 21-31)(emphasis added).

Both parties agree that the "blocking element" in the claims is the same structure as the "center stop" in the specification. It is clear that the purpose of the blocking element/center stop is to seal against fluid flow. This is consistent with the claims, such that when there is no suction the blocking element is against the opening in a closed position and when there is suction the

blocking element and opening separate to allow fluid flow in an open position. Instead of using the "seals against fluid flow" terminology, Plaintiffs proposes a similar but related concept of "blocking, obstructing, or impeding" the opening. However, Plaintiffs appear to not dispute that the blocking element must seal against fluid flow, as they do not dispute this point in the briefing and the arguments during the claim construction hearing were focused on the term "stationary." Further, Plaintiffs do not explain why their prior agreement as to the term "blocking element" as a "structure that seals against fluid flow" should not be applicable in this lawsuit and patent. Consistent with the claims, the specification, and the Prior Order, the Court finds that the term "blocking element" is appropriately limited to sealing against fluid flow.

On the other issue, the Court rejects Defendants' attempt to limit the term to a "stationary" structure. There is nothing in the claims requiring that a blocking element not move. There is nothing in the plain and ordinary meaning of this term that requires the blocking element to be stationary. Further, there is no disclaimer in the prosecution history or specification that would so limit the term. The Court rejects Defendants' argument that because there is only one disclosed embodiment for this term that the Court must necessarily limit the "blocking element" term to a narrow definition supported by an embodiment. The Court finds that the examples in the specification are non-limiting embodiments of the invention that should not be imported into the claims. The Federal Circuit has consistently held that "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water,* 381 F.3d at 1117. Even where a patent describes only a single embodiment, absent a "clear intention to limit the claim scope," it is improper to limit the scope of otherwise broad claim language by resorting to a patent's specification. *Id.*; *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (citing numerous cases

rejecting the contention that the claims of the patent must be construed as being limited to the single embodiment disclosed and stating that claims are to be given their broadest meaning unless there is a clear disclaimer or disavowal); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1988) ("Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."); *Phillips*, 415 F.3d at 1323.

**The Court hereby construes "blocking element" to mean "a physical structure that seals against fluid flow."**

### E. "barrier"

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a structure which obstructs movement by means of physical contact" | "a structure that prevents movement of the valve by means of physical contact during fluid flow" |

The disputed term "barrier" appears in claims 1 and 8 of the '841 patent.

### (1) The Parties' Positions

Plaintiffs submit that the term "barrier" has its plain and ordinary meaning. (*See, e.g.*, Dkt. No. 75 at 12.) Plaintiffs argue that Defendants' construction adds imported limitations from the specification. (*Id.*) Plaintiffs argue that their simple construction is supported by the specification and dictionary definitions. (*Id.* at 12-13.)

Defendants argue that every embodiment disclosed in the specification operates to prevent movement of the valve during fluid flow. (*See, e.g.*, Dkt. No. 79 at 22.) While Plaintiffs' construction is not incorrect, Defendants argue that it is incomplete as the specification makes it clear that the flow bridge performs the barrier function of obstructing by physical contact while

still permitting fluid to flow. (*Id.* at 23.) Without this limitation, Defendants argue that the term will sweep into the scope of the claim structures radically different from what the inventor actually invented. (*Id.* at 23-24.)

Plaintiffs reply that it is improper to read a limitation into the claims absent lexicography or disclaimer. (*See, e.g.*, Dkt. No. 80 at 9.) Plaintiffs argue that the feature of a barrier preventing movement of the valve during fluid flow is not claimed and there is no justification for the limitation of "during fluid flow" for this term. (*Id.*)

### (2) Analysis

In the Prior Texas Litigation, "barrier" was construed to mean a "restraining structure." (*See* Prior Order at 38.)

The parties' primary dispute focuses on whether the barrier prevents movement of the valve "during fluid flow."

The relevant claim language, found in claims 1 and 8, is reproduced below:

a **barrier**, said **barrier** blocking said flexible material from moving beyond a maximum distance after said flexible material moves when the user sucks through said spout to drink from said spout.

(emphasis added.) As expressly claimed, the barrier blocks the flexible material of the valve from moving beyond a maximum distance. The parties both agree that the barrier performs this "blocking" function by means of physical contact. On the one hand, Plaintiffs argue that the structure "obstructs" movement while the Defendants argue that the structure "prevents" movement. Overall, the Court finds that the term "prevents" is more consistent with the meaning of the term barrier as used in the intrinsic record.

Regarding the phrase "of the valve" proposed by Defendants, that concept is rejected as being superfluous to and/or inconsistent with the remaining claim language, which already

specifies that the barrier blocks the flexible membrane. There is no reason to add the "of the valve" limitation to this term's construction. Likewise, regarding the phrase "during fluid flow," while there is an embodiment in the specification that supports Defendants' construction, there is no requirement in the claims that requires such a construction. The Court rejects Defendants' argument that because there is only one disclosed embodiment for this term that the Court must necessarily limit a broad "barrier" term to a narrow definition supported by an embodiment. The Court finds that the examples in the specification are non-limiting embodiments of the invention that should not be imported into the claims. The Federal Circuit has consistently held that "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water,* 381 F.3d at 1117. Even where a patent describes only a single embodiment, absent a "clear intention to limit the claim scope," it is improper to limit the scope of otherwise broad claim language by resorting to a patent's specification. *Id.*; *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (citing numerous cases rejecting the contention that the claims of the patent must be construed as being limited to the single embodiment disclosed and stating that claims are to be given their broadest meaning unless there is a clear disclaimer or disavowal); *Comark Commc'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed. Cir. 1988) ("Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."); *Phillips*, 415 F.3d at 1323.

Finally, while the term "barrier" was construed to mean a "restraining structure" in the Prior Order, the Court finds that the construction of "a structure that prevents movement by

means of physical contact" (language largely agreed by the parties) has the same substantive meaning as the prior construction.

**The Court hereby construes "barrier" to mean "a structure which prevents movement by means of physical contact."**

### F. "maximum distance"

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a greatest permitted amount of space between two points" | Indefinite<br><br>Alternatively, "full extension" |

The disputed term "maximum distances" appears in claims 1 and 8 of the '841 patent.

#### (1) The Parties' Positions

Plaintiffs submit that the term "maximum distance" has its plain and ordinary meaning. (*See, e.g.*, Dkt. No. 75 at 14.) Plaintiffs argue that the claims specify a distance limitation on the movement of the flexible material when the user sucks on the spout, and that the claimed barrier blocks movement beyond a maximum distance. (*Id.*) The claims do not require "full extension" or any kind of "extension." (*Id.*) Plaintiffs argue that there is no reason to ask the jury to determine whether the flexible member extends or reaches a full extension. (*Id.*) Plaintiffs argue that the specification refers to "maximum distance" by stating that the flow bridge blocks movement or expansion of the valve beyond a certain maximum distance, which is the ordinary and customary usage of the English language. (*Id.*) Defendants' construction would omit the "movement" aspect and recite only an "extension" aspect. (*Id.* at 15.) Plaintiffs' construction is allegedly supported by various dictionary definitions, which have nothing to do with "full extension." (*Id.*) Plaintiffs argue that Defendants' construction is wrong because it is not the

plain meaning, it is not supported by any claim language, it omits one prong of what the specification explicitly recites, and it is not in conformance with the common dictionary meaning. (*Id.*)

Defendants argue that the term is indefinite because the term "maximum distance" fails to identify the degree to which the flexible material is permitted to move before being blocked by the barrier. (*See, e.g.*, Dkt. No. 79 at 28.) Defendants argue that the claim language "maximum distance" is a term of degree that tells the person of skill nothing about how much valve movement is permitted. (*Id.* at 29.) According to Defendants, "a maximum distance" is not a meaningful answer to that question without reference to some measurement or datum or method of determining when the movement distance has reached its "maximum" point. (*Id.*) Further, the specification's sole reference to a maximum distance is "to prevent the valve from over extending itself," but that teaching is not meaningful and provides no clear guidance to the term. (*Id.* at 29-30.)

Plaintiffs reply that Defendants offer unsupported arguments that the term "maximum distance" is indefinite. (*See, e.g.*, Dkt. No. 80 at 10.) The specification teaches that the movement or expansion of the valve is blocked beyond a certain maximum distance "to prevent the valve from overextending itself, or from being subjected to excessive strain or distension." (*Id.*) Plaintiffs argue that this provides reasonable certainty as to where the barrier can be placed to create a "maximum distance' based on the variables involved to prevent any overextension.

### (2) Analysis

In the Prior Texas Litigation, the parties did not dispute this term. In this litigation, the parties dispute two issues: whether the term is indefinite and if not whether plain meaning applies.

The relevant claim language, found in claims 1 and 8, is straightforward and is reproduced below:

> a barrier, said barrier blocking said flexible material from moving beyond a <u>maximum distance</u> after said flexible material moves when the user sucks through said spout to drink from said spout.

(emphasis added). The claim language is clear that the barrier blocks the flexible material from moving beyond a certain point, that is, a maximum distance. On the one hand, Plaintiffs seek to define the term in a vacuum and propose a construction solely based on a dictionary definition, without any basis to the specification or claim language. On the other hand, Plaintiffs recognize that, as specifically taught in the specification, the maximum distance is that which "prevent[s] the valve from overextending itself, or from being subjected to excessive strain or distension." (*See, e.g.*, Plaintiffs' Reply Brief, Dkt. No. 80 at 10.) More specifically, Plaintiffs argue that a "maximum distance" may be calculated to prevent any "overextension." (*Id.*)

The Court agrees with Defendants that "a maximum distance"—by itself and without more—is not meaningful, because as the term is used in the claims it requires some reference point to determine when the movement distance of the flexible material has reached its "maximum" point. The specification is quite clear that the maximum distance is that which prevents the valve from overextending itself:

> Flow bridge 84 blocks movement or expansion of the valve 42 beyond a certain **maximum distance** to prevent the valve from overextending itself, or from being subjected to excessive strain or distension, as shown in FIG. 8( e). Thus, the flow bridge prevents the valve from inverting beyond the point where it can no longer easily revert to its original position.

('841 patent, col. 9, ll. 9-15) (emphasis added). Both parties recognize this limitation of the "maximum distance" feature. Contrary to Defendants' arguments, the Court neither finds that this term is indefinite, nor that the language used in the specification is not helpful. Further, the

fact that the "maximum distance" term may be "one of degree" as Defendants suggest does not, by itself, require a finding of indefiniteness. As used in the specification, the maximum distance is that distance which the valve (and/or flexible membrane as specifically utilized in the claims) is permitted to travel before overextending itself. The specification provides an example of this concept, in that it is the point from inverting beyond the point where it can no longer easily revert to its original position. *See id.* The fact that the parties in the Prior Texas Litigation did not dispute this term provides further support that this term can be understood by one of ordinary skill in the art. Still further, the fact that Defendants provide no expert opinions on this issue is, while not dispositive, at least one factor that the Court should consider. There was much discussion of this term during the claim construction hearing and at one point Defendants were agreeable to the Court's proposed construction of "greatest distance permitted before overextension." The Court finds that the "maximum distance" may be less than the full extension or the greatest point before the flexible membrane is overextended. In other words, the claims expressly state that the barrier blocks the flexible material from moving *beyond* a maximum distance. Contrary to Defendants' arguments, the barrier need not be placed specifically at the point of a maximum distance prior to overextension or at the specific point of full extension—it can be specifically set at a position much less than full extension and still block the flexible material from moving beyond a maximum distance. As claimed, the barrier only needs to prevent the flexible membrane from moving beyond the point at which the flexible membrane is subject to overextension.

Thus, the Court finds that there is no dispute that one of ordinary skill in the art would understand the meaning of the term "maximum distance" in the context of the claims and specification. Likewise, the Court finds that there is no dispute that one of ordinary skill in the

art would understand with "reasonable certainty" the scope of the invention and the bounds of the claims. Accordingly, pursuant to the Supreme Court's holding in *Nautilus*, the Court rejects Defendants' arguments that the claim when "read in light of the specification delineating the patent, and the prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."

**The Court hereby construes "maximum distance" to mean "distance permitted before overextension."**

### G. "post"

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a structure elongated along an axis; a vertical upright" | "a protruding structure that seals against fluid flow" |

The disputed term "post" appears in claims 1 and 8 of the '841 patent.

**(1) The Parties' Positions**

Plaintiffs submit that the term "post" has its plain and ordinary meaning and that its construction is informed by the claim language and consistent with specification and dictionary meanings. (*See, e.g.*, Dkt. No. 75 at 16.) Plaintiffs argue that the plain language of claim 8 requires the post to extend through the opening in both the open and closed valve positions; it does not require the post to protrude, be cylindrical, or perform a sealing function as proposed by Defendants. (*Id.* at 16-17.) Plaintiffs argue that neither the specification nor the file history redefines "post" or disclaims or disavows any scope with respect to post. (*Id.* at 17.) Plaintiffs' construction is simply the plain and ordinary meaning of the term, which is based on a dictionary definition of post as being "a vertical support such as a pillar, upright, or fence stake." (*Id.*)

Defendants argue that while there are numerous references to a protruding member in the specification, there is only one reference to a "post." (*See, e.g.*, Dkt. No. 79 at 17.) As "post" is described in the specification as an embodiment of a male sealing or protruding member, the "post" must necessarily be a male sealing or protruding member. (*Id.*) Defendants argue that Applicant's generic statements in the prosecution history that a post need not seal are not helpful and were previously rejected in the Prior Texas Litigation. (*Id.*) Defendants argue that Plaintiffs have provided no reason for the Court to deviate from its prior construction. (*Id.*)

Plaintiffs reply that there is no unequivocal concession in the specification that the post must necessarily seal the opening. (*See, e.g.*, Dkt. No. 80 at 8.) That the protruding member seals the opening is only an aspect of the patent's alternate embodiment and should not be imported into the broader claims. (*Id.*) Plaintiffs also argue that Defendants' citation to prosecution history statements in a parent application regarding this term are not persuasive as it was related to different claim language that is not recited in the '841 patent claims. (*Id.*)

### (2) Analysis

In the Prior Texas Litigation, "post" was construed to mean "a protruding structure that seals against fluid flow." (*See* Prior Order at 31.) This is the construction proposed by the Defendants in this litigation. The parties dispute whether plain and ordinary meaning applies.

Claim 8 recites the "post" limitation, and the relevant language is reproduced below:

(h) a <u>post</u>, wherein the relative position of said <u>post</u> and said opening changes when the user sucks through said spout to drink from said spout;

(i) and wherein said <u>post</u> extends into and through said opening in said closed position and said open position of said valve.

(emphasis added). The language surrounding the term post is straightforward, but not does expressly state that the post is a protruding structure or that it must seal against fluid flow.

While there are numerous references to a protruding member, the specification has only one reference to a "post":

> In the preferred embodiment, center stop or sealing member 101 is provided with a protruding member 108 which extends off of abase 104, as shown in FIG. 15(b) and FIGS. 15(e)-(f). Protruding member 108 is a male sealing or protruding member, which in the closed valve state extends through orifice 118. Preferably, a circular or approximately circular orifice is used, although any shaped orifice can be used consistent with the invention.
>
> **Further preferably, male sealing or protruding member 108 is a <u>post</u> or pin, such as a frustoconical or conical post, or a finger-like shaped member.** Male sealing or protruding member 108 extends off of the base 104 as a protrusion or projection toward the orifice 118. Preferably, sealing or protruding member 108 is tapered. Specifically, in the preferred embodiment, the protruding member 108 has a greater diameter at its bottom portion (near the base 104 of the center seal-off), than its diameter at the top. In the preferred embodiment, base 104 is substantially flat.

('841 patent, col. 10, l. 64 – col. 11, l. 14)(emphasis added). The specification does not state that a sealing member or a protruding member is an embodiment of a post. *See id.* Instead, the specification is clear that the post is one embodiment of a sealing member or protruding member. *See id.*

While the claims expressly require the post to only extend into the opening during a closed and open position, the Court finds that the post must seal against fluid flow. That the post must seal against fluid flow is supported and required by the specification. The specification states that the "male sealing or protruding member 108 is a post or pin." (*See* '841 patent, col. 11, ll. 5-7.) The specification repeatedly characterizes the protruding member as a sealing member and vice versa. Indeed, the abstract of the '841 patent even states that "[a]n initially blocked opening in a flexible material moves up along a protruding member until the opening is unblocked, so as to allow fluid flow." During the claim construction hearing, Plaintiffs provided no other example or purpose of the post other than to be a sealing member. Based on the

specification and the claims, the Court finds that the post must "seal against fluid flow." *See, e.g.*, *Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F. 3d 1296, 1305 (Fed. Cir. 2011) (a court must "strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention"). Further, this construction is consistent with the findings and constructions in the Prior Texas Litigation. The Court rejects Plaintiffs' arguments that merely because the patentee provided self-serving and general statements in the prosecution history (and not made to overcome prior art rejections) that the post need not seal the opening in the valve's closed position.

Further, regarding the disputed shape of the "post," the specification teaches that the protruding member is a "post or pin, such as a frustoconical or conical post, or a finger-like shaped member." (*See* '841 patent at col. 11, ll. 5-7.) In the Prior Texas Litigation, the Plaintiff argued that the term "post" should mean "a pillar, column, shaft, pole, or stake, or upright support (including any shape, size, or configuration head or base)." (*See* Prior Order at 31.) Further, in the briefing of the Prior Texas Litigation, Plaintiffs admitted that "the ordinary and customary meaning of post, pin, and finger-like all include a cylindrical structure." (*See* Prior Order at 37.) The Court finds that Plaintiffs' proposed constructions on the shape of a post are not particularly helpful. Further, Plaintiffs have not provided any compelling argument why a post is not a "protruding structure," as supported in the specification and claims and as found by the Prior Order. Thus, the Court finds the shape of the post to be "a protruding structure," consistent with that found in the Prior Texas Litigation.

**The Court hereby construes "post" to mean "a protruding structure that seals against fluid flow."**

**H. "wherein the relative position of said post and said opening changes"**

| Plaintiffs'<br>Proposed Construction | Defendants'<br>Proposed Construction |
|---|---|
| "the post or the opening moves relative to one another" | "wherein the post and opening separate to permit fluid flow" |

The disputed term "wherein the relative position of said post and said opening changes" appears in claim 8 of the '841 patent.

### (1) The Parties' Positions

Plaintiffs submit that the disputed term simply means that the post or the opening moves relative to one another. (*See, e.g.*, Dkt. No. 75 at 17.) The claim language does not say that the post and the opening "separate." (*Id.* at 18.) The claims only state that the relative position changes. (*Id.*) Defendants' construction would require the jury to consider what it means to "separate" and what degree of separation is required for there to be infringement. (*Id.*) In contrast, claim 8 calls for other items to separate, and the use of separate with respect to other elements but not to the disputed term is strong evidence that separate does not apply to this phrase. (*Id.*) Plaintiffs argue that their construction is supported by dictionary definitions of "relative" and "position." (*Id.*)

Defendants argue that Plaintiffs' construction merely rearranges the claim language but provides no clarity to its meaning to the jury. (*See, e.g.*, Dkt. No. 79 at 19.) The question here is how the relative position of the post and opening changes when the user sucks through the spout to drink. (*Id.*) Defendants argue that its proposal answers the question—the post and opening separate to permit fluid flow, thereby enabling the user to drink. (*Id.*) Defendants argue that the claim language is consistent with the language used in the specification. (*Id.* at 19-20.) Further, because the post is a structure that seals against fluid flow, in order for the relative position of the

post and opening to change in a way that enables the user to drink, the post and opening must unseal, or separate, to permit fluid flow. (*Id.*)

Plaintiffs reply that Defendants attempt to rewrite the claims to add a function that is not recited or required by the claims. (*See, e.g.*, Dkt. No. 80 at 8.) The claim element at issue does not recite the function of permitting fluid flow, nor does it specify how the post and opening must move relative to one another. (*Id.* at 9.) Had the inventor wanted to claim a specific direction or type of motion between the opening and the post, he could have done so. (*Id.*)

### (2) Analysis

The parties' primary dispute is whether the post and opening must "separate" from each other to allow fluid flow.

The Court finds that this dispute largely revolves around the actual claim language. Claim 8 recites the "post" limitation with the "relative position . . . changes" phrase, and the relevant language is reproduced below:

> (h) a post, <u>wherein the relative position of said post and said opening changes</u> when the user sucks through said spout to drink from said spout;
>
> (i) and wherein said post extends into and through said opening in said closed position and said open position of said valve.

(emphasis added). The claim language does not recite the term "separate," nor does it expressly require the post and opening to separate as the Defendants suggest.

The phrase "relative position" is not used in the specification. As mentioned above in relation to the "post" term, the specification teaches that an opening moves up along a protruding member until the opening is unblocked, so as to allow fluid flow. *See, e.g.*, Abstract. The term "separate" is never used in relation to the post or the opening. Further, the fact that the same claim 8 uses the term "separate" in another context (*e.g.*, "causing said opening and said

blocking element to separate") implies that a "separate" limitation was not intended for this disputed phrase. Still further, there is no clear meaning on what "separate" means in this context—must it be fully separate or partially separate or not touching. The Court rejects Defendants' arguments to the contrary.

The Court finds that, based upon the claim language, all that is required is that the relative position of said post and said opening changes when the user sucks through the spout. The claim language does not necessarily require that both the post and the opening change positions or that they must separate from each other. The Court finds that Plaintiffs' construction provides the most appropriate meaning to the disputed phrase.

**The Court hereby construes "wherein the relative position of said post and said opening changes" to mean "the post or the opening moves relative to one another."**

## V. CONCLUSION

The Court adopts the above constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby **ORDERED**, in good faith, to mediate this case with the mediator agreed upon by the parties. As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of

settlement that might arise during such mediation. Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.

**So Ordered and Signed on this**

**Jul 18, 2015**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE